**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PORTIA E. MCCOLLUM,<br>Derivatively on Behalf of<br>HEALTHCARE SERVICES GROUP,<br>INC., | )<br>)<br>)<br>) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) | |
| | ) | |
| THEODORE WAHL and JOHN C. SHEA, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| HEALTHCARE SERVICES GROUP, INC., a<br>Pennsylvania corporation, | )<br>) | |
| | ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Portia E. McCollum ("Plaintiff"), by her undersigned attorneys, for this Verified Shareholder Derivative Complaint, alleges upon personal knowledge with respect to herself and her transactions in Healthcare Services Group, Inc. ("Healthcare Services" or the "Company"), and upon information and belief based upon, *inter alia*: the investigation of counsel; the allegations of the amended complaint in *Utah Retirement Systems v. Healthcare Services Group, Inc.*, *et al.*, Case No. 2:19-cv-01227-ER (E.D. Pa.) (the "Securities Class Action"), which is presently pending in this Court; Healthcare Services' public filings with the United States Securities and Exchange Commission (the "SEC"); and other publicly available information, including press releases and analysts' reports about the Company.

## I.    INTRODUCTION

1.    This is a shareholder derivative action on behalf of nominal defendant Healthcare Services, pursuant to Pa. R. Civ. P. 1506.

2.    Healthcare Services provides outsourced housekeeping and dining services to long-term and post-acute healthcare facilities in the United States.  The Company's customers include over three thousand facilities, such as nursing homes, assisted living facilities, skilled nursing facilities, rehabilitation centers, and psychiatric hospitals.

3.    Theodore Wahl ("Wahl") and John C. Shea ("Shea") (the "Individual Defendants") engaged in a long-term scheme to make it appear that the Company met or exceeded analysts' consensus estimates for the Company's earnings per share ("EPS"), a key financial metric relied upon by investors as an indicator of a company's profitability.

4.    In March 2017, investment analyst Monocle Accounting Research ("Monocle") issued a report (the "Monocle Report") revealing that the Company had manipulated its reported EPS in the last forty-four consecutive quarters.

5.    According to the Monocle Report, Healthcare Services had improperly rounded up EPS results during each of these quarters.  The Monocle Report stated that it was "improbab[le] that this is the result of anything but the active management of the company's EPS."  Monocle ran the calculations and noted that, since the odds of rounding up EPS are theoretically the same as rounding down EPS, the results are the equivalent of flipping a coin and coming up with heads forty-four times in a row, "the odds of which are a staggering **1 in 17.6 trillion**."  (Emphasis in original).[1]

---

[1] All emphasis herein is added unless otherwise indicated.

2

6.     In November 2017, the SEC initiated an initial-stage investigation, or a "Matter Under Inquiry" ("MUI"), into Healthcare Services' manipulation of its EPS.

7.     In March 2018, five months after initiating its MUI, the SEC escalated its investigation to a "Formal Order of Investigation" and issued a subpoena to the Company.,

8.     The Individual Defendants, however, concealed that the Company had been subpoenaed by the SEC, publicly asserting that there was "no" pending investigation into the Company or its practices.  On December 31, 2018, the Company filed a Form 8-K with the SEC, attaching a document that affirmatively represented that: "[t]here are **no actions, suits, proceedings or investigations pending**" against the Company.  The Individual Defendants also concealed that in the fourth quarter of 2018, the Company had authorized its outside counsel to conduct an internal investigation into the matters related to the SEC subpoena, under the direction of the Company's Audit Committee.

9.     Finally, on March 4, 2019, almost two years after the Monocle Report first reported EPS manipulation by the Company, Healthcare Services revealed that the SEC had been investigating the Company's EPS calculations and practices for approximately sixteen months.  The Company further disclosed that, during the fourth quarter of 2018, it had authorized "outside counsel" to conduct an internal investigation under the direction of the Company's Audit Committee into matters related to the SEC's March 2018 subpoena.  Healthcare Services announced that it would delay the filing of its Annual Report on Form 10-K due to the ongoing investigation.

10.     The revelation of the SEC's investigation sent Healthcare Services' stock plummeting.  The price of Healthcare Services' stock fell by $4.96 per share on March 4, 2019, closing at a price of $32.78 per share, down 13.14% from the prior day's closing price of $37.24

per share.  As a relatively low-volatility stock, this was the largest single percentage decline in the Company's thirty-nine-year trading history.

11.     Since March 4, 2019, the Company has acknowledged that the SEC investigation, which had already cost the Company millions of dollars in legal expenses and fees to a "Big Four" auditing firm for forensic services, "could result in potential sanctions or penalties" and "could adversely affect or cause variability in our financial results."

12.     On March 22, 2019, Stephen Koch ("Koch") filed the initial complaint in the Securities Class Action (the "*Koch* Action").

13.     On April 24, 2019, Plaintiff sent a demand letter to the Board of Directors (the "Board") of Healthcare Services pursuant to 15 PA Cons. Stat. § 1781(a)(1) (the "Demand").  In the Demand, Plaintiff demanded that the Board commence a civil action against defendants Wahl and Shea for breach of their fiduciary duties to Healthcare Services, to recover the "costs and expenses associated with the defense of the *Koch* Action; reimburse the Company for reputational harm caused by the improper EPS calculation and reporting; and indemnify the Company for the sanctions or penalties imposed by the SEC, as well as any damages incurred in connection with the *Koch* Action."  *See* Exhibit A (a true and correct copy of April 24, 2019 letter to the Company's Board, care of Dana Frese, Healthcare Services General Counsel, and proof of delivery) annexed hereto, at 8.

14.     In addition, Plaintiff demanded that the Board disclose the details of the internal investigation conducted by the Company regarding its EPS calculation and reporting, and the bases for the conclusion in the 2019 Form 10-K "Management's Annual Report Over Financial Reporting," that "our principal executive officer and principal financial officer concluded that the Company's internal control over financial reporting as of December 31, 2018 is effective as a

whole." *Id.*

15.    The Company's Board has not, to date, responded to the Demand.    Upon information and belief, the Board has neither appointed a special litigation committee to consider litigation against defendants Wahl and Shea, nor commenced an action against the Individual Defendants for the claims identified in the Demand.    Pursuant to 15 PA Cons. Stat. § 1781(a)(1), Plaintiff therefore maintains this action to enforce the rights of the Company.

16.    An amended complaint in the Securities Class Action was filed by lead plaintiff Utah Retirement Systems (the "Securities Class Action Lead Plaintiff") on September 17, 2019, alleging claims for violations of the federal securities laws on behalf of all shareholders who purchased or otherwise acquired common stock of Healthcare Services on the NASDAQ exchange and/or through transactions within the United States during the class period from April 8, 2014 to March 4, 2019, inclusive (the "Class Period"), and were damaged thereby.

17.    On April 24, 2020, this Court denied a motion to dismiss filed by the defendants in the Securities Class Action.

18.    The Individual Defendants' wrongful conduct constitutes a breach of the fiduciary duties they owed to the Company.    The Individual Defendants' wrongful conduct has forced Healthcare Services to incur millions of dollars in costs related to the SEC investigation and the internal investigation, as well as costs incurred in defending the Securities Class Action.    In addition, the Individual Defendants' breach of fiduciary duties has caused reputational harm to the Company and has exposed Healthcare Services to potential sanctions and penalties by the SEC, as well as hundreds of millions of dollars in potential damages in the Securities Class Action.

## II.     JURISDICTION AND VENUE

19.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.     This Court has jurisdiction over each defendant named herein because each defendant is an individual who has sufficient minimum contacts with Pennsylvania so as to render the exercise of jurisdiction by the Pennsylvania courts permissible under traditional notions of fair play and substantial justice.   The defendants had continuous and systematic contacts with Pennsylvania through the Company's conduct of its business and its Bensalem, Pennsylvania corporate headquarters.

21.     Venue is proper in this Court because one or more of the defendants either reside in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained herein, including the Individual Defendants' breach of the fiduciary duties they owed to Healthcare Services occurred in this District, and the Individual Defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in the District.

## III.     THE PARTIES

### Plaintiff

22.     Plaintiff is, and has been, continuously throughout all times relevant hereto, the owner of Healthcare Services' common stock.  Plaintiff is a citizen and resident of Virginia.

### Nominal Defendant

23.     Nominal Defendant Healthcare Services is a Pennsylvania corporation and maintains its principal executive offices at 3220 Tillman Drive, Suite 300, Bensalem, Pennsylvania

19020.  The Company provides outsourced housekeeping and dining services to long-term and post-acute healthcare facilities in the United States.  Healthcare Services' common stock is traded on the NASDAQ Global Select Market under the ticker symbol "HCSG."

**The Individual Defendants**

24.     Individual Defendant Wahl has served as the Company's President and Chief Executive Officer ("CEO") since May 2015.  Wahl is the son-in-law of Daniel P. McCartney ("McCartney"), the Company's former Chairman of the Board and CEO who founded Healthcare Services in 1976.  Wahl joined the Company in 2004.  Wahl served as HCSG's President and Chief Operating Officer ("COO") from April 2012 through April 2015.  Wahl has held other positions with the Company, including Executive Vice President, Vice President of Finance, Regional Manager, Regional Sales Director, District Manager, and Facility Manager.  Prior to joining the Company, Wahl was a senior manager with the Transaction Advisory Group at Ernst & Young LLP.  Healthcare Services' public filings tout Wahl's "financial expertise," which enables him to "provide guidance with respect to [the Company's] operations."  During the prolonged series of fraudulent behavior permitted and/or caused by defendants, Wahl signed various Healthcare Services SEC filings, made other public statements that are alleged herein to have been knowingly or recklessly false and misleading when made, participated in earnings conference calls, and was listed as a "Company Contact" on earnings press releases, and/or had the ability to control statements made by or on behalf of the Company.  Furthermore, Wahl became a director in 2011 and was a director as of April 24, 2019, the date Plaintiff made the Demand.  Wahl is a citizen and resident of the State of Pennsylvania.

25.     Individual Defendant Shea has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since April 2012.  Shea joined the Company in 2009 as the

Director of Regulatory Reporting and, prior to his appointment as CFO, served in various positions with the Company, including Secretary, Vice President of Finance, and Chief Accounting Officer. Prior to joining the Company, Shea was a senior manager with the Transaction Advisory Group at Ernst & Young LLP.  During the prolonged series of fraudulent behavior permitted and/or caused by defendants, Shea signed various Healthcare Services filings, made other public statements that are alleged herein to have been knowingly or recklessly false and misleading when made, and/or had the ability to control statements made by or on behalf of the Company.  Shea, through his position as CFO, served as a point-of-contact between the Company and the SEC and/or otherwise knew or should have known about the SEC's investigation of the Company as shown by, *inter alia*, Shea being the recipient and author of publicly filed correspondence between the Company and the SEC.  Shea is a citizen and resident of the State of Pennsylvania.

**Non-Defendant Directors**

26.     Michael E. McBryan ("McBryan") has been the Executive Vice President and Chief Revenue Officer of the Company since 2012.  McBryan joined the Company in 1988.  Prior to his appointment as Executive Vice President and Chief Revenue Officer, McBryan served as Senior Vice President, Divisional Vice President, Regional Sales Director, District Manager, and Facility Manager of the Company.  McBryan became a director in 2011 and was a director as of April 24, 2019, the date Plaintiff made the Demand.

27.     Jude Visconto ("Visconto") was appointed Chairman of the Board in 2017 and has served as a director of the Company since 2015.  Visconto was Chairman of the Board as of April 24, 2019, the date Plaintiff made the Demand.

28.     John M. Briggs ("Briggs") has served as a director of the Company since 1993 and was a director as of April 24, 2019, the date Plaintiff made the Demand.

29.     Robert L. Frome ("Frome") has served as a director of the Company since 1983 and was a director as of April 24, 2019, the date Plaintiff made the Demand.

30.     Diane S. Casey ("Casey") has served as a director of the Company since 2011 and was a director as of April 24, 2019, the date Plaintiff made the Demand.

31.     Robert J. Moss ("Moss") has served as a director of the Company since 1992 and was a director as of April 24, 2019, the date Plaintiff made the Demand.  On April 21, 2020, Moss informed the Board that he would not stand for re-election to the Board at the Company's annual meeting.

32.     Dino D. Ottaviano ("Ottaviano") has served as a director of the Company since 2007 and was a director as of April 24, 2019, the date Plaintiff made the Demand.

33.     John J. McFadden ("McFadden") has served as a director of the Company since 2012 and was a director as of April 24, 2019, the date Plaintiff made the Demand.

34.     Daniella Castagnino ("Castagnino") has served as a director of the Company since 2018 and was a director as of April 24, 2019, the date Plaintiff made the Demand.

## IV.     THE FRAUDULENT SCHEME

### A.     Defendants Manipulate and Overstate the Company's EPS to Meet Consensus Estimates and Maintain the Company's Reputation for Modest Growth and Long-Term Consistency

35.     Beginning more than a decade ago, in 2006, the Individual Defendants caused the Company to manipulate its quarterly EPS results to encourage investors to view the Company as having a sustained track record for consistent and predictable results.  This manipulation enabled the Company to round up the third digit after the decimal point (representing tenths of a cent) for its reported EPS, ensuring that Healthcare Services would avoid falling short of analysts' EPS targets.  This allowed the Company to meet or beat analyst estimates over the course of more than

forty consecutive quarters, with the exception of three quarters in which "extraordinary" matters required the Company's reported EPS to fall short of analysts' expectations.  Indeed, the Company repeatedly met consensus EPS estimates precisely to the penny.

36.    On March 22, 2017, Monocle published the Monocle Report, which described the uncanny, and highly statistically improbable, manner in which Healthcare Services regularly met consensus EPS targets for more than a decade (and touted its success in achieving related company records).  The Monocle Report summarized its findings in four bullet points:

- "A review of a decade's worth of earnings reports reveals an odd and concerning pattern, that of 'strategic rounding' of quarterly earnings per share."

- "Strong evidence suggests earnings management over the long term is likely at least partially responsible for HCSG's steadily increasing valuation to the current nosebleed level."

- "While earnings management is not necessarily illegal, at the very least, it signals an aggressive approach to accounting that increases exposure to restatement risk, enforcement proceedings and securities fraud claims."

- "All this while the founder and [then-] chairman has disposed of tens of millions of dollars-worth of stock."

37.    The Monocle Report noted that "[i]f a company is not actively manipulating [its results]," then a company's EPS in any given quarter should have an equal chance of rounding down to the nearest penny as rounding up to the nearest penny.  Monocle further noted that an analysis of all stocks in the S&P 500 over the last number of years shows this to be the case, with companies' quarterly EPS figures rounding down to the nearest penny roughly the same number of times that they round up.

38.    However, in the case of Healthcare Services, Monocle noted that "every single quarter over the past 11 years has seen [the Company's] quarterly earnings per share round up

rather than round down to the nearest penny."

39.     The Monocle Report noted that the Company, which "peddl[es] a boring suite of essential services to an important part of the healthcare industry," had seen stock price growth that "has been anything but boring, having climbed 250% split-adjusted over the past 10 years."  The Monocle Report suggested that a significant factor driving the price of the Company's stock was its steady EPS growth, which "while modest, is nonetheless commendable in today's economic environment."  The Monocle Report also noted that Healthcare Services' stock was trading an increasing multiple to its EPS, which was attributable, in part, due to "the almost uncanny manner in which HCSG regularly meets quarterly consensus sell-side EPS expectations."

40.     According to the Monocle Report, Healthcare Services' consistent EPS results were highly suspicious in light of the uncertainties that all businesses encounter, stating:

> Whenever analyzing the equities of the various companies in which we have interest, we always keep in mind the axiom that "business is messy." In other words, even the best-run business is subject to the vagaries of its customers, vendors, competitors and/or industry. Considering that axiom, it is strange indeed that HCSG's quarterly EPS has matched, to the penny, the consensus EPS expectations more often than not over the last five, 10, and even 20 years.

In contrast to the results of an analysis of stocks in the S&P 500 index, which showed EPS results that "rounded down" to the nearest penny roughly as often as they "rounded up," Healthcare Services' EPS showed a pattern of consistently rounding up to meet consensus EPS estimates. The Monocle Report concluded, "[w]e believe the reason this has occurred is simple – **HCSG appears to have actively and aggressively managed its quarterly EPS for over a decade.**" (Emphasis in original).

41.     To illustrate the subtle manner in which the Company was able to achieve its EPS consistency, the Monocle Report specifically pointed to an example of the Company's quarter four ("Q4") 2016 results (announced on February 7, 2017), where the Company's reported quarterly

11

net income  of $20,299,000 yielded an EPS calculation of $0.2758, which rounded up to an EPS of $0.28 – which was the consensus EPS estimate.  The Monocle Report stated the significance of this 58 hundredths of a cent to the Company: "had HCSG's net income been a mere $62,000 less, then HSCG's diluted EPS would have been less than $0.2750, and would have, therefore, rounded down to $0.27, giving investors the disappointment of a $0.01 EPS miss."

42.    Included in the Monocle Report was the following table that showed EPS calculations for forty-four quarters, from quarter one ("Q1") 2006 through Q4 2016, indicating that, "every single quarter over the past 11 years has seen HCSG's quarterly earnings per share round up rather than round down to the nearest penny" (which prompted the SEC investigation):

|  | Net income | Diluted weighted average shares | Earnings per share (A) | Rounded EPS (B) | B-A |
|---|---|---|---|---|---|
| Q416 | 20299000 | 73590000 | 0.2758 | 0.28 | 0.0042 |
| Q316 | 19711000 | 73592000 | 0.2678 | 0.27 | 0.0022 |
| Q216 | 18760000 | 73316000 | 0.2559 | 0.26 | 0.0041 |
| Q116 | 18626000 | 73014000 | 0.2551 | 0.26 | 0.0049 |
| Q415 | 9134000 | 72903000 | 0.1253 | 0.13 | 0.0047 |
| Q315 | 17086000 | 72691000 | 0.2350 | 0.24 | 0.0050 |
| Q215 | 16288000 | 72286000 | 0.2253 | 0.23 | 0.0047 |
| Q115 | 15516000 | 72159000 | 0.2150 | 0.22 | 0.0050 |
| Q414 | 15472000 | 71722000 | 0.2157 | 0.22 | 0.0043 |
| Q314 | -22182000 | 70671000 | -0.3139 | -0.31 | 0.0039 |
| Q214 | 13921000 | 71206000 | 0.1955 | 0.20 | 0.0045 |
| Q114 | 14639000 | 71072000 | 0.2060 | 0.21 | 0.0040 |
| Q413 | 5452000 | 70898000 | 0.0769 | 0.08 | 0.0031 |
| Q313 | 13790000 | 70531000 | 0.1955 | 0.20 | 0.0045 |
| Q213 | 12933000 | 69370000 | 0.1864 | 0.19 | 0.0036 |
| Q113 | 14954000 | 69361000 | 0.2156 | 0.22 | 0.0044 |
| Q412 | 12798000 | 68988000 | 0.1855 | 0.19 | 0.0045 |
| Q312 | 11517000 | 68635000 | 0.1678 | 0.17 | 0.0022 |
| Q212 | 11320000 | 68228000 | 0.1659 | 0.17 | 0.0041 |
| Q112 | 8578000 | 68085000 | 0.1260 | 0.13 | 0.0040 |
| Q411 | 10565000 | 67705000 | 0.1560 | 0.16 | 0.0040 |
| Q311 | 9996000 | 67530000 | 0.1480 | 0.15 | 0.0020 |
| Q211 | 9828000 | 67545000 | 0.1455 | 0.15 | 0.0045 |
| Q111 | 7767000 | 67454000 | 0.1151 | 0.12 | 0.0049 |
| Q410 | 9123000 | 67232000 | 0.1357 | 0.14 | 0.0043 |
| Q310 | 9169000 | 44719000 | 0.2050 | 0.21 | 0.0050 |
| Q210 | 8721000 | 44652000 | 0.1953 | 0.20 | 0.0047 |
| Q110 | 7428000 | 44659000 | 0.1663 | 0.17 | 0.0037 |
| Q409 | 6566000 | 66705000 | 0.0984 | 0.10 | 0.0016 |
| Q309 | 8225000 | 44334000 | 0.1855 | 0.19 | 0.0045 |
| Q209 | 7815000 | 44262000 | 0.1766 | 0.18 | 0.0034 |
| Q109 | 7736000 | 44073000 | 0.1755 | 0.18 | 0.0045 |
| Q408 | 7283000 | 43948000 | 0.1657 | 0.17 | 0.0043 |
| Q308 | 5522000 | 43980000 | 0.1256 | 0.13 | 0.0044 |
| Q208 | 6953000 | 43962000 | 0.1582 | 0.16 | 0.0018 |
| Q108 | 6857000 | 44213000 | 0.1551 | 0.16 | 0.0049 |
| Q407 | 7305000 | 44033000 | 0.1659 | 0.17 | 0.0041 |
| Q307 | 7299000 | 43969000 | 0.1660 | 0.17 | 0.0040 |
| Q207 | 7524000 | 29140000 | 0.2582 | 0.26 | 0.0018 |
| Q107 | 7450000 | 29108000 | 0.2559 | 0.26 | 0.0041 |
| Q406 | 7227000 | 28986000 | 0.2493 | 0.25 | 0.0007 |
| Q306 | 6564000 | 28760000 | 0.2282 | 0.23 | 0.0018 |
| Q206 | 6203000 | 28691000 | 0.2162 | 0.22 | 0.0038 |
| Q106 | 5676000 | 28620000 | 0.1983 | 0.20 | 0.0017 |

43.     According to the Monocle Report, it was "improbab[le] that this is the result of anything but the active management of the company's EPS."  The Monocle Report noted that,

since the odds of rounding up EPS are theoretically the same as rounding down EPS, the results are the equivalent of flipping a coin and coming up with heads forty-four times in a row, "the odds of which are a staggering **1 in 17.6 trillion.**"  (Emphasis in original).  Further demonstrating the remote probability of these results, including how "more times than not, HCSG's quarterly diluted EPS rounded up by more than 0.4 cents," the Monocle Report noted that "[i]f HCSG's quarterly diluted EPS figures were, in fact, randomly derived over the past 11 years, then the odds of this occurring are roughly **1 in 600 quadrillion**."  (Emphasis in original).

44.     To put further context to the highly unusual and improbable string of EPS results reported by the Company, the Monocle Report stated:

> It is worth noting though that we have spoken with the CFOs of multiple publicly-traded companies about what would be necessary to achieve a string of 44 straight EPS results that rounded up to the nearest penny, and ***the feedback that we have received is that it would be a fairly difficult thing to accomplish through legitimate accounting practices***, considering the multitude of accounting entries that a company is faced with in any given quarter.

45.     The Monocle Report connected the suspicious rounding of EPS results to Individual Defendant Wahl and Matt McKee, the Company's Chief Communications Officer: "[c]oincidentally, this strange pattern began just a few quarters after McCartney's two sons-in-law joined the company."  The Monocle Report suspected that driving higher valuation multiples would have benefited anyone selling the stock, including McCartney, who was then the Company's Chairman and (according to the Monocle Report) had sold $23.4 million in stock since July 2015 and gifted another $4.2 million worth of stock during that period.

46.     Monocle noted that, "[w]e reached out to Daniel McCartney, Ted Wahl and Matt McKee to ask for an explanation of this unusual pattern but have yet to receive a response."  The Monocle Report also stated that its findings had been reported to the SEC.

47.     On the date that the Monocle Report was published, the price of Healthcare Services' stock fell by $0.79 per share to close at $42.16 per share on March 23, 2017, a decline of 1.84%, on above-average volume.   As discussed further herein, the Company's stock later rebounded to $45.55 per share after defendants dismissed analyst questions about the findings of the Monocle Report on an earnings call.

48.     The Company consistently reported EPS that, barring unusual circumstances, met or exceeded analyst expectations for years, up until around the time that the SEC commenced its MUI into the Company's EPS practices in November 2017.

49.     After the SEC initiated its inquiry of the Company's EPS practices in November 2017, the Company missed analyst estimates for four consecutive quarters starting with Q4 2017, and continued to miss analyst estimates through the first six months of 2019.

50.     In the one quarter in which the Company reported EPS that exceeded analysts' consensus estimates, Q4 2018 (announced in a press release dated February 5, 2019), EPS was driven by extraordinary items that temporarily increased net income in the quarter.   The Company's reported EPS of $0.42 per diluted share for Q4 2018 beat consensus estimates by $0.05 per share.  However, according to a February 5, 2019 report by analyst Jacob Johnson of Stephens, Inc., after backing out the extraordinary items (which included a $15 million beneficial change in workers' compensation expenses, a $6 million accounts receivable reserve adjustment, and a $4.1 million change to deferred compensation), "EPS would have been 35 cents (30 cents assuming 22% tax rate."  Thus, absent the extraordinary events of Q4 2018, the Company would have missed consensus EPS estimates for all seven consecutive quarters since the start of the SEC investigation.

1.     **Defendants Evade Questions About the Monocle Report and the Company's EPS Practices, and McCartney Abruptly Resigns as Chairman of the Board**

51.     Despite the Monocle Report's suggestion of potential fraud at the highest levels of

the Company's directorship and management, and the fact that the Monocle Report expressly stated that the Company's leadership had been contacted about its EPS practices, the Company dismissed the report by touting its actual performance (increased revenues and profits) without providing any specific answer refuting the Monocle Report's finding and analysis.

52.    On April 12, 2017, the Company held an earnings conference call to discuss its quarterly results (the "April 12, 2017 Call").  Individual Defendant Wahl participated on behalf of the Company.  During the portion of the April 12, 2017 Call dedicated to questions from securities analysts, Robert W. Baird analyst Andrew John Wittmann ("Wittmann") asked:

> My last question here is just on some of the reports that came out about the company quarterly results being rounded up for a long period of time on the quarter. The annual results clearly don't round up, but I think just given that this has gotten some attention, it'd be worth having you guys comment on that and just give us your thoughts on that.

53.    Individual Defendant Wahl responded to this question evasively and defensively, while feigning ignorance of the Monocle Report:

> I can tell you – ***without knowing exactly what article or more specifically what iteration of articles you're referring to***, I can tell you we believe our best efforts are spent actually running the company and delivering outcomes for our customers, our employees and all our shareholders, ***not the latest and greatest investor sentiment with third-party articles and blogs***. And I would say regardless of bias, Andy, whether they're positive or negative, God knows there's plenty of both out there. And when you look at ***over the past 10 or so years*** that you have mentioned, our track record really speaks for itself. We've tripled the size of the company, customers, employees, revenues, and profits.  We've paid out more than $400 million in dividends during that timeframe. And most importantly, we position the company today to surpass that performance and deliver for all of our stakeholders over the next decade. So again, I think our track record of ***performance over the past 10 years*** really stands on its own.

54.    The market took comfort in Wahl's dismissal of the Monocle Report's conclusions and assurances regarding the Company's track record of performance over the past decade.  In response, on April 12, 2017, Healthcare Services' stock price rose by $3.37 per share to close at

$45.55 per share, a gain of nearly 8%.

55.     Oddly, in his response, Wahl's denial of any knowledge about the Monocle Report's findings actually demonstrates that he, in fact, knew exactly what "reports" to which analyst Wittmann was referring.  In his question, Wittmann did not mention the Monocle Report by name or otherwise indicate that the "reports" about the Company's EPS rounding were presented online in a "blog" format published on the Seeking Alpha website, nor did Wittmann mention that the thesis (or title) of the Monocle Report was that the Company's EPS practices involved "a decade of strategic rounding."  Nonetheless, Wahl responded with a reference to "third party articles and blogs," and two references to the Company's performance in the past ten years – neither of which would make any sense other than to reveal Wahl's knowledge of the Monocle Report and its analysis.

56.     Approximately three weeks after the Monocle Report was published, and one day before the April 12, 2017 Call, McCartney, the Company's founder and Chairman since its inception, informed the Company's Board that he would not stand for re-election as Chairman. McCartney's term as Chairman ended on May 31, 2017.

57.     Monocle issued a follow-up report on April 17, 2017 titled *Healthcare Services Group: More "Strategic Rounding" and Other Shenanigans*.  In this follow-up report, Monocle noted that, despite having alerted the Company's management to its finding in March (before releasing the Monocle Report), the Company's most recent EPS also rounded up (from $0.2977 to $0.30), allowing the Company to beat consensus estimates by a penny, "mark[ing] the 45th time in a row that HCSG's EPS rounded up instead of down," extending the coin-flip analogy to call the Company's forty-five consecutive quarters of EPS rounding up a one in 35.2 trillion occurrence.  Monocle's follow-up report also referenced the question-and-answer exchange with

analyst Wittmann during the April 12, 2017 call and noted that "Mr. Wahl's claim to not know to which article Mr. Wittmann was referring was fairly unbelievable, as we both alerted HCSG's management to our upcoming article and sought comment from management about the conclusion we drew from the company's pattern of EPS rounding through the years."  Monocle also found Wahl's response to Wittmann's question to have been "completely nonresponsive."

**2.      Defendants Conceal the EPS Manipulation Scheme, the SEC Investigation, and the Company's Internal Investigation**

58.      On or before November 2017, the SEC launched its MUI into the Company's EPS practices and sent a request for information to the Company.

59.      The SEC's inquiry escalated to a formal investigation no later than March 2018, when the Company received a subpoena from the SEC.  Under the SEC's rules, the SEC cannot issue a subpoena until its staff members have been "designated as officers in a formal order of investigation."  SEC Division of Enforcement, Enforcement Manual (Nov. 28, 2017), at § 3.2.6. The Company, as the target of the subpoena, had the right to request or view the SEC's formal order, which details the nature of the investigation and explained the potential securities law violations under investigation.

60.      During Q4 2018, Healthcare Services authorized an "internal investigation" conducted by "outside counsel" in connection with the subject matter of the SEC investigation. The internal investigation was sufficiently extensive and complex such that it had not been completed as of March 4, 2019, and, in connection with the SEC's investigation, had cost the Company at least $8 million to date.

61.      For sixteen months, the Individual Defendants caused Healthcare Services to conceal the SEC investigation into the Company's EPS practices.

62.     At no point prior to March 4, 2019 did the Company disclose the ongoing SEC investigation, including the SEC's November 2017 request for information or the March 2018 formal investigation and subpoena to the Company.

63.     As of December 31, 2017, Healthcare Services had a $300 million bank line of credit on which to draw for general corporate purposes.  The line of credit was set to expire on December 18, 2018.

64.     On December 21, 2018, the Company entered into a new $475 million credit facility, which replaced the $300 million line of credit (the "New Credit Facility").  The New Credit Facility was documented by a credit agreement (the "Credit Agreement"), which was filed with the SEC as an Exhibit to a Form 8-K, signed by Individual Defendant Shea, after markets closed on December 31, 2018.  The version of the Credit Agreement filed with the SEC does not include a signature or the name of the person who signed on behalf of the Company, but on information and belief, such an agreement would be authorized by the Individual Defendants.  In fact, pursuant to the Credit Agreement, only a limited number of individuals could serve as an "Authorized Officer" for the Company under the Credit Agreement, including Individual Defendant Wahl (as CEO and President) and Individual Defendant Shea (as CFO).

65.     According to the Credit Agreement, the Company falsely represented that there were no investigations pending against it.  Specifically, the Credit Agreement stated, at Section 6.1.5: "There are no actions, suits, proceedings, or investigations pending or, to the knowledge of any Loan Party, threatened against such Loan Party or any Subsidiary of such Loan Party at law or in equity before any Official Body which individually or in the aggregate could reasonably be expected to result in any Material Adverse change."  In the Credit Agreement, an "Official Body" was defined to include the United States Government and governmental agencies that would

include the SEC.

66.     Notwithstanding this clear statement in the Credit Agreement that there were no pending investigations, the SEC had launched an investigation into the Company's EPS practices through the 2017 request for information concerning the Company's EPS practices and the March 2018 formal investigation and subpoena.  In addition, the Company authorized an "internal investigation" conducted by "outside counsel" into EPS rounding.  The Company has since acknowledged that these investigations were material, exposed the Company to considerable potential liability, and caused the Company to incur millions of dollars in expenses.

67.     Given the Individual Defendants' close control over the Company, they were not only aware of the SEC investigation, but were involved in the Company's response.

**B.      The SEC's Investigation and the Gravity of the Company's EPS Misconduct is Revealed**

68.     On March 4, 2019, Healthcare Services announced (the "March 4, 2019 Announcements"), for the first time, that it was the subject of an SEC investigation into the Company's EPS rounding and reporting practices.  In a Form 8-K filed with the SEC, the Company stated:

> Healthcare Services Group, Inc. (the "Company") received a letter in November 2017 from the Securities and Exchange Commission (the "SEC") regarding an inquiry that the SEC is conducting into earnings per share ("EPS") calculation practices and requesting that the Company voluntarily provide certain information and documents relating to its EPS rounding and reporting practices. The Company also received a subpoena in March 2018 from the SEC in connection with these matters.
>
> Since the inception of the inquiry, the Company has been providing information and documents to the SEC. Additionally, during the fourth quarter of 2018, the Company authorized its outside counsel to conduct an internal investigation, under the direction of the Company's Audit Committee, into matters related to the SEC subpoena. The Company continues to cooperate with the SEC's investigation.

69.     The Company separately announced that it would delay the filing of its Annual Report because its "internal investigation" remained incomplete.  Specifically, the Company stated, "[t]he Company and its outside counsel continue to work expeditiously to conclude the internal investigation and have determined to delay the filing of the Form 10-K until the Audit Committee determines that the internal investigation is complete.  The Company currently expects to complete the internal investigation and file the Form 10-K with the SEC on or before the fifteenth calendar day following the prescribed due date."

70.     In response to these revelations, the price of Healthcare Services' stock fell sharply, declining by $4.96 per share, from $37.74 per share, to close at $32.78 per share, a drop of 13.14%. The stock price decline on this date translated to a loss of $367 million in shareholder value.

71.     The Company's March 4, 2019 Announcements came approximately sixteen months after the Company first received notice that the SEC was investigating its EPS practices in November 2017, approximately a year after the SEC's subpoena, and somewhere between two-and-a-half and five months after the Company launched its "internal investigation" in Q4 2018. Moreover, the March 4, 2019 Announcements came nearly two years after Monocle informed Wahl and McCartney about Monocle's EPS allegations, reported its findings to the SEC, and published the Monocle Report.

72.     Nearly two weeks later, in its late-filed Annual Report on Form 10-K that was filed with the SEC on March 18, 2019, the Company confirmed the materiality of the SEC's investigation, disclosing that the SEC investigation into its EPS calculation practices could "***result in potential sanctions or penalties . . . which could adversely affect or cause variability in [its] financial results***."

73.     While the Company also reported that it had completed its internal investigation into the EPS rounding, it did not report the findings of that internal investigation in its March 18, 2019 Form 10-K.

74.     Months later, in the Company's Form 10-Q filed on May 3, 2019, the Company reiterated the materiality of the SEC's investigation, noting that "the ongoing SEC investigation" could result in "substantial costs" to the Company.

75.     On February 21, 2020, the Company filed its Annual Report for the year ended December 31, 2019 with the SEC on Form 10-K (the "2020 Form 10-K").  In the 2020 Form 10-K, the Company disclosed that the SEC investigation was still ongoing.  The Company also disclosed that it could face substantial liability in connection with that investigation and the Securities Class Action:

> Beginning in November 2017, the Company has been in dialogue with the SEC regarding EPS calculation, rounding and reporting practices and in March 2018 we learned that the SEC had opened a formal investigation into these matters. In response to the SEC's investigation, during the fourth quarter of 2018, the Company authorized its outside counsel to conduct an internal investigation, under the direction of the Company's Audit Committee regarding these matters. The internal investigation was completed in March 2019 and prior to the filing of our Annual Report on Form 10-K for the fiscal year ended December 31, 2018.
>
> Notwithstanding the completion of the internal investigation, the SEC's investigation is ongoing and there can be no assurance that the SEC or another regulatory body will not make further regulatory inquiries or pursue further action that could result in significant costs and expenses including potential sanctions or penalties as well as distraction to management. The ongoing SEC investigation and/or any related litigation could adversely affect or cause variability in our financial results.
>
> On March 22, 2019, a putative shareholder class action lawsuit alleging violations of the federal securities laws was filed against the Company and our Chief Executive Officer in the U.S. District Court for the Eastern District of Pennsylvania in connection with the matters related to the SEC investigation. The class action complaint was amended on September 17, 2019. . . . We cannot predict the outcome of the lawsuit, the magnitude of any potential losses or the effect such litigation may have on us or our operations. Regardless of the outcome, lawsuits and

investigations involving us, or our current or former officers and directors, could result in significant expenses and divert attention and resources of our management and other key employees. We could be required to pay damages or other penalties or have injunctions or other equitable remedies imposed against us or our current or former directors and officers including any obligation to indemnify our current and former directors and officers in connection with lawsuits, governmental investigations and related litigation or settlement amounts. Such amounts could exceed the coverage provided under our insurance policies. Any of these factors could harm our reputation, business, financial condition, results of operations or cash flows. In addition, the Company may be subject to further litigation from third parties related to the matters under review by the SEC.

1.     **The Significance of EPS**

76.     EPS is one of the most important financial metrics relied upon by investors and securities analysts. EPS "contains all the information required for evaluating an investment in a company's shares, compressed (aggregated) into a single number that purports to represent how much the company earned per share of stock issued." Israel Klein, *A Change in Accounting, A Change in Law*, 42 Del. J. Corp. L. 51, 56 (2017). The metric reflects the portion of a company's "profits" that are allocated to each common share. At its most basic, EPS is calculated by taking the company's net income for the relevant period (quarterly or annually) and dividing that amount by the total number of outstanding common shares. Generally speaking, a higher reported EPS is attractive to investors since it reflects greater profitability.

77.     Investment analysts that research and follow publicly-traded companies often include, as part of their analysis, estimates of companies' anticipated EPS in coming fiscal quarters and/or on an annual basis. These estimates are based on the analysts' assessments of various factors that include, as a significant component of the estimate, the company's reported financial results from prior periods and its public statements. Analysts' EPS estimates are then also based on financial modeling and analyses of various industry-specific and market information. Analysts' EPS estimates are intended to provide guidance to investors about a company's expected

earnings and profitability.  Since EPS estimates may vary from analyst to analyst due to variances in proprietary modeling, markets look to "consensus" EPS estimates, which are essentially the average of multiple analysts' EPS estimates.  Consensus EPS estimates are widely reported financial information that is published in the financial press, online and on financial industry platforms like Bloomberg.

78.     In the case of Healthcare Services, analysts' reliance on company-provided financial data and public statements also included more than a decade's worth of manipulated and overstated EPS results.  Analysts likely considered the Company's consistent and manipulated EPS performance when determining their EPS estimates, infecting those targets with the false and misleading information provided by the Company.

79.     Whether or not a company meets, exceeds, or fails to meet consensus EPS estimates is a material consideration for investors.  An earnings "miss" in a particular quarter that is not tied to some extraordinary event (*e.g.*, due to the occurrence of a large, one-time corporate expense) can have a major negative impact on a company's stock price.

80.     Indeed, a reported EPS that falls short of consensus estimates by as little as a penny can have – and, for numerous companies, has had – a major negative impact on a company's stock price.  In his oft-cited 1998 speech titled *The Numbers Game*, former SEC chairman Arthur Levitt ("Levitt") observed, "I recently read of one major U.S. company, that failed to meet its so-called 'numbers' by one penny, and lost more than six percent of its stock value in one day." Arthur Levitt, *The Numbers Game*, speech delivered to the NYU Center for Law and Business (Sept. 28, 1998), https://www.sec.gov/news/speech/speecharchive/1998/spch220.txt.

81.     Levitt's observation of the connection between EPS misses of as little as a single cent and major negative stock price reaction has been echoed by others.  *See, e.g.,* Matthew S.

Mokwa, *Enron, Sarbanes-Oxley, and the End of Earnings Management*, Tex. J. Bus. L., Fall 2003 ("Mokwa"), at 325, 335-36 ("If management . . . miss the consensus estimates by as little as one cent per share, the market capitalization of the company may decline precipitously in response."). *See also* George W. Dent, Jr., *The Essential Unity of Shareholders and the Myth of Investor Short-Termism*, 35 Del. J. Corp. L. 97, 123 (2010) (an "[a]nnouncement that a company has fallen (or expects to fall) short of analysts' forecasts typically causes its stock price to fall more than would be predicted by a mere problem with one quarter's earnings").

82.     While there may be one-time events that impact whether a company meets earnings projections, the investing public's reaction to earnings misses is often the result of the market's perception of a company's financial stability and credibility.  Indeed, because analyst "projections are based in part on information provided by the companies themselves, meeting them not only speaks to the value of the company's shares, but the company's credibility as well."  Deborah M. House, *Lessons Learned the Hard Way*, 24 No. 10 ACC Docket 28, 34.

83.     As Wall Street's earnings estimates "are based almost exclusively on information released by management in various corporate disclosures," it follows that "management is capable of exercising tremendous influence over its stock price by manipulating the information it discloses in its financial statements."  Mokwa at 335.

84.     When reporting the Company's quarterly financial performance to investors, the Company regularly prioritized its EPS results in an apparent reflection of the market's focus on the metric.  For example, in the Company's April 11, 2017  press release, the Company noted, "net income for the three months ended March 31, 2017 was $22.0 million, or ***$0.30 per basic and diluted common share***, compared to the three months ended March 31, 2016 net income of $18.6 million, or **$0.26 per basic and diluted common share**."

85.     Likewise, on a conference call to discuss results for the Q1 of 2017 with investors and investment analysts, the Company began by noting that "[n]et income for the quarter increased to $22 million or $0.30 per share, and both net income and *earnings per share for the quarter were company records*."

86.     In response to the Company's focus on its EPS results, analysts focused on the Company's EPS in assessing its reported performance, as well as the fact that the Company's EPS consistently met or beat analyst estimates.  For example, in April 2014, a William Blair analyst noted that the Company's results were "exactly in line with the consensus forecast; earnings per share were *$0.21*."  On July 11, 2017, a William Blair analyst noted that the Company reported "solid second quarter 2017 results," with EPS of $0.30 being just above the Street's $0.29 target.  Similarly, on July 11, 2017, in a report titled *A Strong 2Q17 Driven by Upside on Both Revenue & Rollout Timing on New Service Agreements*, a UBS securities analyst noted that "HCSG reported 2Q2017 adjusted EPS of $0.30, $0.02/$0.01 ahead of UBSe/cons."  Likewise, on October 17, 2017, in a report titled *3Q17 EPS in line; Fine-tuning estimates*, a Credit Suisse analyst noted in the beginning of the report that "3Q17 EPS meets consensus ($0.31)."

87.     The Company's EPS results, and the consistency with which it met or beat analyst estimates during the prolonged series of fraudulent behaviors, helped the Individual Defendants position Healthcare Services as a relative bastion of financial stability in an otherwise volatile market.  On February 7, 2017, in a report titled *First Look at Largely In-Line Fourth Quarter Results*, a William Blair securities analyst noted that the Company reported "relatively in-line fourth quarter 2016 results" and that "GAAP EPS were equal to the $0.28 consensus forecast."  The analyst concluded that "we continue to view Healthcare Services Group as a high-quality long-term holding – one that offers healthcare investors a safe haven investment (and income)

opportunity in volatile markets."

C.   **Healthcare Services' EPS Manipulation Strategies**

88.   A company's EPS is found by determining the net income in any given period and dividing that by the average number of outstanding shares (net income/outstanding shares).   In order to manipulate EPS, the Company deliberately altered net income through improper expense reduction measures.

89.   The Company operates under two principal segments: Housekeeping and Dietary. The number of facilities serviced by the Dietary segment currently is smaller than the number of facilities serviced by Housekeeping, with approximately 1,500 dining facilities, compared to more than 3,500 for Housekeeping.   Until around 2015, Housekeeping accounted for the majority of the Company's revenues – as high as 66% of total revenues as reported in the Company's fiscal year ("FY") 2013 Form 10-K filed with the SEC on February 21, 2014.   More recently, however, Dietary has accounted for a larger proportion of the Company's revenues and currently makes up slightly more than half of total revenues.

90.   For the Housekeeping segment, operating performance was significantly impacted by labor costs, which management analyzed as a percentage of revenues in order to normalize and evaluate such costs to reflect changes in the Company's growth.   Labor costs accounted for approximately 81% of Housekeeping revenues in FY 2014, 80% of Housekeeping revenues in FY 2015, 80.2% of Housekeeping revenues in FY 2016, 80.1% of Housekeeping revenues in FY 2017, and 78.8% of Housekeeping revenues in FY 2018.   While labor costs comprise a smaller proportion of expenses for the Dietary segment, they are still materially significant, accounting for 51% of Dietary revenues in FY 2014, 53% of Dietary revenues in FY 2015, 53.8% of Dietary revenues in FY 2016, 56.6% of Dietary revenues in FY 2017, and 57.2% of Dietary revenues in

FY 2018.

91.     Among other things, defendants were able to achieve materially significant changes to the Company's reported EPS – in fractions of pennies – through manipulation of the primary driver of the Company's expenses: labor costs.

92.     The Company's labor costs regularly accounted for the majority of its costs of services, particularly for the Housekeeping segment.  According to confidential witnesses cited in the Securities Class Action, the Company intentionally understaffed facilities to keep labor expenses below budgeted amounts to meet financial goals, while the quality of service and patient care suffered as a consequence.  The cost reduction was achieved, in part, simply by cutting the number of hours worked by hourly employees who were paid at or near minimum wage.

93.     In addition, the Company designated lower-level employees as "managers" so that they could be put on a fixed salary that would not require the payment of overtime.  By fixing the expenses associated with those employees, Healthcare Services could extract more hours of labor from each employee, including hours above the typical forty-hour overtime threshold, without incurring additional variable costs.  As a consequence, the Company was a defendant in multiple class action lawsuits brought by employees who were designated as "managerial" employees and paid a fixed salary (rather than on an hourly basis) and were made to work beyond forty hours per week at tasks that typically are performed by hourly employees that would be entitled to overtime pay.  These employment-related "misclassification" class actions were filed in multiple states (Colorado, Ohio, and Texas) and ultimately settled for millions of dollars.  One of these cases was a nationwide class action brought on behalf of over 800 employees, *Kelly v. Healthcare Services Group, Inc.*, Case No. 2:13-cv-00441-JRG (E.D. Texas) (the "*Kelly* Action").  In the *Kelly* Action, former housekeeping managers employed by the Company alleged that they were misclassified as

exempt from overtime requirements of the Fair Labor Standards Act.  The *Kelly* Action plaintiffs alleged, in part, that they were underpaid pursuant to the Company's unlawful rounding timesheet practices and policy.  Under this policy, employees were not permitted to punch in, sign in, or begin work seven or more minutes after the end of their scheduled shift, without the prior approval of a supervisor.  An internal memorandum circulated to the Company's Senior Vice Presidents, Divisional Vice-Presidents, Regional Vice-Presidents/Managers/Directors, and District Managers demonstrated that the rounding policy was put in place partly to avoid the obligation to pay "an additional quarter hour of wages."  The class actions filed in Colorado and Ohio alleged substantially similar violations and have since settled.

**D.    The Securities Class Action**

94.    On March 22, 2019, Koch filed the initial complaint in the Securities Class Action. An amended complaint was filed by the Securities Class Action Lead Plaintiff on September 17, 2019, for violations of the federal securities laws on behalf of all shareholders who purchased or otherwise acquired common stock of Healthcare Services on the NASDAQ exchange and/or through transactions within the United States during the Class Period, and were damaged thereby.

95.    In the amended complaint, the Securities Class Action Lead Plaintiff alleged that the Company and certain officers and/or directors issued, or caused to be issued, materially false and misleading statements, and failed to disclose material information that rendered other statements materially false and misleading.  Specifically, the Securities Class Action Lead Plaintiff alleged, *inter alia*, that the defendants issued false and materially misleading net income and EPS results in the Company's financial statements throughout the Class Period; failed to disclose the existence of the SEC investigation and the Company's internal investigation; made materially false and misleading statements concerning the adequacy of the Company's financial controls and

reporting system; and made materially false and misleading statements in connection with the Company's New Credit Facility.

96.    On April 24, 2020, this Court sustained the amended complaint by denying a motion to dismiss filed by the defendants in the Securities Class Action.

**E.    The SEC's Investigation Remains Ongoing**

97.    The SEC's inquiry commenced on or about November 2017 and escalated to a formal order of investigation on or before March 2018.  That investigation remains ongoing, and it has costed the Company millions of dollars.

98.    In March 2019, the market moved on the initial report of the SEC's investigation. On March 4, 2019, the stock fell on this news by more than 13%, falling $4.96 per share and closing at a price of $32.78, down from the prior day's closing price of $37.74 per share.

99.    In a research report titled *Management Addresses 10-K Delay and SEC Inquiry*, a Credit Suisse analyst explained that "HCSG traded down more than 15% this afternoon following the company's release that it will delay the filing of its 10-K pending the completion of an internal audit review which is expected to conclude in the next 2 weeks."  The analyst added, "[t]he internal review, which began 4Q18, stems from an SEC preliminary inquiry received in November 2017 which was followed by a subpoena in March 2018."  The analyst added, "[t]he revelation of the SEC inquiry is disappointing, and we would have liked to have seen earlier disclosure of the SEC subpoena."

100.    On March 4, 2019, a Bloomberg article titled *Healthcare Services Falls After Delaying 10-K Over SEC Inquiry* noted: "Healthcare Services Group sank as much as 14%, its biggest drop in a decade, after saying it is working with outside counsel to conclude the internal investigation based on the SEC's inquiry about EPS calculation practices dating back to November

2017."

101.    The Company has noted that "[t]he SEC's investigation into our earnings per share ("EPS") calculation practices could result in potential sanctions or penalties, distraction to our management and result in further litigation from third parties, each of which could adversely affect or cause variability in our financial results."

102.    In the 2020 Form 10-K, the Company stated: "[w]e could be required to pay damages or other penalties or have injunctions or other equitable remedies imposed against us or our current or former directors and officers including any obligation to indemnify our current and former directors and officers in connection with lawsuits, governmental investigations and related litigation or settlement amounts. Such amounts could exceed the coverage provided under our insurance policies. Any of these factors could harm our reputation, business, financial condition, results of operations or cash flows."

## V.    DAMAGES SUFFERED BY HEALTHCARE SERVICES

103.    The Individual Defendants' EPS manipulation scheme and subsequent cover-up regarding the SEC's inquiry and investigation directly and proximately caused damages suffered and to be suffered by Healthcare Services.  The Company has expended millions of dollars in costs and expenses in connection with the SEC investigation, in defending the Securities Class Action, and through retaining an outside law firm to conduct an internal investigation.  Furthermore, Healthcare Services has and will continue to suffer reputational harm, is exposed to substantial liability in regulatory sanctions and penalties, and faces hundreds of millions of dollars in potential liability in the Securities Class Action.

## VI.    DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

104.    Plaintiff brings this action derivatively in the right of and for the benefit of

Healthcare Services to redress injuries suffered, and to be suffered, by Healthcare Services as a direct result of the breaches of fiduciary duty by the Individual Defendants.

105.    Healthcare Services is named as a Nominal Defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff is, and at all times relevant hereto has been, a continuous shareholder of Healthcare Services.

106.    Plaintiff will adequately and fairly represent the interests of Healthcare Services and its shareholders in prosecuting and enforcing their rights.  Prosecution of this action, independent of the Board, is in the best interests of the Company.

107.    The wrongful acts complained of herein subject, and will continue to subject, Healthcare Services to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

108.    Healthcare Services' current Board consists of the following individuals: Visconto, Wahl, McBryan, Briggs, Frome, Casey, Ottaviano, McFadden, and Castagnino.

109.    On April 24, 2019, Plaintiff sent the Demand to the Board of Healthcare Services. In the Demand, Plaintiff demanded that the Board commence a civil action against Individual Defendants Wahl and Shea for breach of their fiduciary duties to Healthcare Services to recover the "costs and expenses associated with the defense of the *Koch* Action; reimburse the Company for reputational harm caused by the improper EPS calculation and reporting; and indemnify the Company for the sanctions or penalties imposed by the SEC, as well as any damages incurred in connection with the *Koch* Action."  *See* Exhibit A at 8.

110.    In addition, Plaintiff demanded that:

The Board take additional action, including, but not limited to the disclosure of the details of the internal investigation conducted by the Company regarding its EPS

calculation and reporting, including the bases for the conclusion in the 2019 Form 10K "Management's Annual Report Over Financial Reporting," that "our principal executive officer and principal financial officer concluded that the Company's internal control over financial reporting as of December 31, 2018 is effective as a whole."

*Id*.

111.   The Company's Board has not, to date, responded to the Demand.   Upon information and belief, the Board has neither appointed a special litigation committee to determine whether to initiate litigation, nor commenced an action against the Individual Defendants for the claims identified in the Demand.   Pursuant to 15 PA Cons. Stat. § 1781(a)(1), Plaintiff may, therefore, maintain this action to enforce the rights of the Company.

## COUNT I
### (Derivatively Against the Individual Defendants for Breach of Fiduciary Duties)

112.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

113.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Healthcare Services' business and affairs.

114.   Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

115.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Healthcare Services.

116.   In breach of their fiduciary duties owed to Healthcare Services, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading

33

statements of material fact and material omissions that failed to disclose: (1) that the Individual

Defendants perpetrated and perpetuated an eleven-year EPS manipulation scheme; (2) the data

released in the March 22, 2017 Monocle Report, showing that Healthcare Services' EPS results

must have been the result of active manipulation, as the random rounding up of a number for forty-

four consecutive quarters entails a probability of 1 in 17.6 trillion; (3) the SEC's initial-stage

investigation starting in November 2017; (4) that, in March 2018, the SEC's initial-stage

investigation escalated to a "Formal Order of Investigation"; (5) that the Company had authorized

an outside law firm to conduct an internal investigation in Q4 2018; (6) that the Company would

suffer serious damages upon revelation of the aforementioned practices; and (7) the Company

failed to maintain proper internal controls.  As a result of the foregoing, the Company's public

statements omitted material facts and/or were materially false and misleading.

117.    The Individual Defendants also failed to correct and caused the Company to fail to

correct the false and misleading statements and omissions of material fact.

118.    In breach of their fiduciary duties, the Individual Defendants failed to maintain

adequate internal controls over financial reporting.

119.    The Individual Defendants had actual or constructive knowledge that the Company

issued materially false and misleading statements and/or omitted material statements, and they

failed to correct the Company's statements, representations, or representations omitting material

facts.  The Individual Defendants had actual knowledge of the misrepresentations and omissions

of material fact set forth herein, or acted with reckless disregard for the truth, in that they failed to

ascertain and to disclose such facts, even though such facts were available to them.  Such material

misrepresentations and omissions were knowingly or recklessly made and were for the purpose

and effect of perpetrating, facilitating, and perpetuating the manipulation of Healthcare Services'

EPS.

120.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of manipulating Healthcare Services' EPS.

121.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

122.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Healthcare Services has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## <u>COUNT II</u>
### (Derivatively Against the Individual Defendants for Unjust Enrichment)

123.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

124.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Healthcare Services.

125.    The Individual Defendants either benefited financially from the improper conduct, including through insider sales, or received bonuses, stock options, or similar compensation from

Healthcare Services that was tied to the performance of EPS, other performance measures, and/or the artificially inflated valuation of Healthcare Services, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

126.    Plaintiff, as a shareholder and a representative of Healthcare Services, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

<u>**COUNT III**</u>
**(Derivatively Against the Individual Defendants for Abuse of Control)**

127.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

128.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Healthcare Services, for which they are legally responsible.

129.    As a direct and proximate result of the Individual Defendants' abuse of control, Healthcare Services has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Healthcare Services has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

<u>**COUNT IV**</u>
**(Derivatively Against the Individual Defendants for Waste of Corporate Assets)**

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Healthcare Services to waste valuable corporate assets, incurring many millions of dollars conducting the internal investigation, defending the ongoing SEC investigation, and defending the Securities Class Action. Moreover, Healthcare Services has suffered and continues to suffer significant reputational and economic damage.

132.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Healthcare Services, and that Plaintiff is an adequate representative;

(b)    Declaring that the Individual Defendants have breached their fiduciary duties to Healthcare Services;

(c)    Directing the Individual Defendants, jointly and severally, to account for all losses and/or damages sustained by Healthcare Services by reason of the acts and omissions complained of herein, together with pre-judgment and post-judgment interest;

(d)    Awarding Healthcare Services restitution from the Individual Defendants, and each of them;

(e)    Awarding Plaintiff's attorneys' fees, expert fees, and other costs, expenses, and disbursements of this action; and

(f)    Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury.

DATED:  July 13, 2020

**GRABAR LAW OFFICE**

**OF COUNSEL:**

Joshua H. Grabar (PA Bar No. 82525)
One Liberty Place

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: gms@rl-legal.com

1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Facsimile: (267) 507-6048
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

38

## **VERIFICATION**

I, PORTIA E. MCCOLLUM, hereby verify that I am the plaintiff in this action, I have reviewed the allegations made in the foregoing complaint (the "Complaint"), and I have authorized the filing of the Complaint.  As to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

7/4/2020

Executed this ____ day of July, 2020.

DocuSigned by:

*Portia McCollum*

1EFEJ602225BAF8C2

PORTIA E. MCCOLLUM