**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE HEALTHCARE SERVICES GROUP, INC. DERIVATIVE LITIGATION** | Case No. 2:20-cv-03426-WB |

## <u>MEMORANDUM OPINION</u>

Co-Lead Plaintiffs[1] have submitted a Motion for Final Approval of Derivative Settlement and Motion for Award of Attorney's fees and Litigation Expenses in support of their unopposed motion for final approval of the Settlement of the above-captioned derivative action pursuant to Federal Rule of Civil Procedure 23.1, brought on behalf of Healthcare Services Group, Inc. ("HCSG" or the "Company"), and in support of their motion for an award of attorneys' fees and reimbursement of litigation expenses.

The terms of the Settlement are set forth in Exhibit A to Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement ("Prelim. Appr. Mot.") which also resolves a consolidated derivative action pending in the Court of Common Pleas of Bucks County, Pennsylvania, and the shareholder demands made on HCSG by the following shareholders on the following dates: (i) Chris Kilmer dated November 27, 2019, (ii) Greg Frownfelter dated April 23, 2020, (iii) Michael Shore dated June 30, 2020, and (iv) Douglas Batdorf dated February 22, 2021 (collectively, the "Shareholder Demands").  Co-Lead Counsel[2] seek an award of $1 million in

---

[1] "Co-Lead Plaintiffs" are (1) Plaintiffs Maria Batan and Clemente Batan; and (2) Plaintiff Portia E. McCollum. "Plaintiffs" are Portia E. McCollum, Maria Batan, Clemente Batan, David J. Reisman, Liisa Ivary, and Arnold Berezin.

[2] "Co-Lead Counsel" are the law firms of Rigrodsky Law, P.A. and Scott+Scott Attorneys at Law LLP.

attorneys' fees and expenses for their time and efforts in litigating this action and negotiating the Settlement (the "Fee and Expense Request").

## I.      INTRODUCTION

This matter came to resolution through a proposed Settlement that was reached with the assistance of an experienced private mediator.  As set forth below, the proposed Settlement of these derivative actions satisfies each of the *Girsh* factors.  *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).  Accordingly, the Settlement shall be approved.

The Settlement provides real benefits to HCSG and its shareholders, as it directly addresses the deficiencies that led to HCSG's regulatory problems related to its financial reporting.  As Plaintiffs alleged, HCSG routinely rounded up its earnings per share ("EPS") results for 44 quarters.  This led to an investigation into the Company by the U.S. Securities and Exchange Commission ("SEC") and the filing of a related securities fraud class action complaint in this Court, *Koch v. Healthcare Servs. Grp., Inc.*, No. 2:19-cv-01227 (the "Securities Class Action"). The Company also incurred expenses in conducting its own internal investigation into these practices.  This included the engagement of outside counsel and resulted in delayed financial reporting of the Company's required annual report on Form 10-K.  The proposed Settlement if approved will resolve all claims that the HCSG Board of Directors (the "Board") and officers breached their fiduciary duties to the Company by failing to install, maintain, and monitor adequate financial reporting and internal control systems to prevent the alleged improper practices.[3]  In exchange for the release of Co-Lead Plaintiffs' claims, the Board will adopt, for a minimum of three years, comprehensive corporate governance reforms that target the alleged wrongdoing and

---

[3] The Defendants entered into the Settlement without acknowledging any fault, liability, or wrongdoing maintaining that all the claims and contentions asserted hereunder are without merit.

lapses of Board- and management-level supervision and internal controls that Plaintiffs contend permitted the wrongdoing to occur. The Settlement includes structural accounting and internal control reforms designed to ensure a more independent, rigorous, and effective oversight of internal control over financial reporting.

HCSG's Board stipulated and agreed that the Company's decision to implement and/or continue the Corporate Governance Reforms[4] appears to be "substantially due to the institution, prosecution, and settlement of the Shareholder Demands and Actions."[5]

Due to Plaintiffs' efforts, the Company has, *inter alia*, undertaken and/or agreed to maintain, for a minimum term of three (3) years, enhanced processes for documenting, reviewing, and approving entries for the recording of its financial transactions, backed by revised internal audit, enterprise risk management, and Sarbanes-Oxley Act of 2002 ("SOX") procedures and controls, and improved through regular reporting to the Audit Committee by both the Company's compliance and legal departments. The Settlement strengthens enforcement and implementation of the foregoing Reforms by requiring the creation and maintenance of Director of Compliance and Director of Accounting positions, each of whom must support the Compliance Department in carrying out internal audit and enterprise risk management functions. These improvements are reinforced by the new requirement that the Company's General Counsel report to the Audit Committee quarterly regarding the Company's legal and regulatory compliance issues. In addition, the Company has agreed to a series of improvements to the Company's accounting automation, finance and accounting training, and Generally Accepted Accounting Principles

---

[4] The corporate governance reforms are described in Exhibit A to the Settlement Stipulation, at ECF No. 10-3 (the "Reforms," and the "Reforms Stip.").

[5] The "Actions" are: *McCollum v. Wahl*, Case No. 2:20-cv-03426 (E.D. Pa.); *Batan v. Wahl*, Case No. 2:21-cv-02810 (E.D. Pa.); *Reisman v. Wahl*, C.A. No. 2021-03255 (Bucks County Ct. Com. Pl.); *Berezin v. Wahl*, C.A. No. 2021-03366 (Bucks County Ct. Com. Pl.).

("GAAP") and internal controls over financial reporting ("ICFR") compliance training.   The Reforms are therefore squarely aimed at, and focused on reducing the chances of, a recurrence of the precise wrongdoing Plaintiffs have alleged.  The Board has determined that the Reforms confer substantial benefits on HCSG and its shareholders, and that the Settlement is fair, reasonable, and adequate.

The Settlement is the product of rigorous, arm's length negotiations among sophisticated parties represented by experienced counsel and mediated by Robert A. Meyer, Esq., of JAMS, a mediator experienced in complex business litigation, including securities class and derivative lawsuits (the "Mediator").

The other *Girsh* factors show that the Settlement was reached through a fair process and was in the best interests of the parties given the complexity and likely duration of ongoing litigation, and significant risks of Plaintiffs not proving liability or damages.  Indeed, as further detailed *infra*, derivative actions are complex, difficult, and notoriously unpredictable, further supporting the Settlement as a salutary result.

Finally, the recovery falls within the range that might be found reasonable and adequate, the notice provided to HCSG shareholders provided adequate information and an opportunity to be heard, and, importantly, no objections to the Settlement or the Fee and Expense Request have been received.

For the reasons set forth below, Co-Lead Plaintiffs' motion for an award of attorneys' fees and reimbursement of expenses shall also be granted.

## II.   SUMMARY OF ALLEGATIONS AND PROCEDURAL HISTORY

### A.   Procedural Background

#### 1.   The Pennsylvania Federal Derivative Actions

On April 24, 2019, Plaintiff Portia E. McCollum ("McCollum") sent a pre-suit demand

under Pennsylvania law (the "McCollum Demand"), to the Board that it commence a civil action against certain defendants for breach of their fiduciary duties to HCSG to recover the costs and expenses associated with the defense of the Securities Class Action and to reimburse the Company for reputational harm and costs incurred in defending against litigation incurred as a result of the improper conduct alleged. *McCollum v. Wahl, et al.*, No. 2:20-cv-03426 (E.D. Pa. July 13, 2020). McCollum demanded that the Board implement various corporate governance reforms at the Company. On July 13, 2020, McCollum commenced a stockholder derivative action in this Court (the "*McCollum* Derivative Action") on behalf of HCSG to remedy alleged breaches of fiduciary duty and other violations of law allegedly committed by the Individual Defendants. *McCollum v. Wahl, et al.*, No. 2:20-cv-03426 (E.D. Pa.).

On October 21, 2019, Maria and Clemente Batan (the "Batan Plaintiffs") sent a substantially similar pre-suit demand under Pennsylvania law to the Board. *Batan, et al. v. Wahl, et al.*, No. 2:21-cv-02810 (E.D. Pa. June 24, 2021). Therein, the Batan Plaintiffs demanded that the Board investigate and take all necessary actions to remedy the alleged breaches of fiduciary duty. On June 24, 2021, the Batan Plaintiffs commenced a stockholder derivative action (the "*Batan* Derivative Action") in this Court on behalf of HCSG seeking substantially similar relief as in the *McCollum* Derivative Action.[6] *Batan, et al. v. Wahl, et al.*, No. 2:21-cv-02810 (E.D. Pa.).

On July 30, 2020, the Court approved a stipulated stay of the proceedings in the *McCollum* Derivative Action pending the outcome of an investigation conducted by the Company's special litigation committee into the allegations in the *McCollum* Derivative Action. On June 29, 2021, the parties in the *McCollum* and *Batan* Derivative Actions submitted a joint stipulation consolidating the actions and appointing co-lead counsel and liaison counsel, which the Court

---

[6] The *McCollum* and *Batan* Derivative Actions filed in this Court sought substantially similar relief as the *Reisman/Ivary* and *Berezin* Derivative Actions brought in the State Court.

granted.

### 2.      The Pennsylvania State Court Actions

On December 2, 2020, Plaintiff David J. Reisman ("Reisman") sent a pre-suit demand to the Board pursuant to Pennsylvania law, demanding that the Board take action to remedy substantially the same wrongdoing alleged in the *McCollum* and *Batan* Derivative Actions and take action to implement corporate governance reforms targeted to prevent a reoccurrence of such misconduct. On June 21, 2021, Plaintiffs Reisman and Liisa Ivary ("Ivary") commenced a stockholder derivative action (the "*Reisman/Ivary* Derivative Action") on behalf of HCSG to remedy alleged breaches of fiduciary duty and requesting any other relief deemed necessary by the Court of Common Pleas of Bucks County, Pennsylvania (the "State Court"). *Reisman, et al. v. Wahl, et al.*, No. 2021-03255 (Bucks County Ct. Com. Pl.).

On November 3, 2020, Plaintiff Arnold Berezin issued a substantially similar pre-suit demand to the Board under Pennsylvania law.  On June 24, 2021, Berezin also commenced a stockholder derivative action (the "*Berezin* Derivative Action") in the State Court on behalf of HCSG seeking substantially similar relief as in the *Reisman/Ivary* Derivative Action. *Berezin, et al. v. Wahl, et al.*, No. 2021-03366 (Bucks County Ct. Com. Pl.).

On June 29, 2021, the parties in the *Reisman/Ivary* and *Berezin* Derivative Actions submitted a joint stipulation proposing consolidation of those actions and appointing co-lead counsel and liaison counsel, which the Court granted on July 6, 2021.

### 3.      Settlement Negotiations

Settlement negotiations proceeded as follows:

On July 14, 2021, Defendants sent Plaintiffs a list of remedial and governance measures undertaken by HCSG since the receipt of Plaintiffs' respective pre-suit demands.

On July 29, 2021, Plaintiffs sent to Defendants a formal and confidential settlement

demand which outlined a proposed framework for settlement of the Derivative Actions and included, *inter alia*, comprehensive proposed corporate governance reforms to address the alleged wrongdoing regarding the Company's accounting functions, controls, personnel, and methodologies used in the accounting itself, and improve oversight over the same, designed to prevent a reoccurrence of the wrongdoing Plaintiffs alleged.

On August 25, 2021, the Defendants responded by letter to Plaintiffs' July 29, 2021 settlement demand. Defendants agreed, in whole or in part, to several measures proposed by Plaintiffs. Following receipt of Defendants' August 25, 2021 letter, Plaintiffs requested additional documents relating to the work performed by HCSG and HCSG's independent consultant, CFGI, which Defendants provided on September 22, 2021.

On October 8, 2021, the Settling Parties agreed to engage in mediation, and agreed to the Mediator, who has extensive experience mediating complex shareholder disputes, including securities class actions and derivative actions. After inquiry by Plaintiffs regarding the nature of certain corporate governance reforms undertaken by the Company, on November 8, 2021, Defendants provided Plaintiffs with additional documents to review. Thereafter, Plaintiffs submitted their settlement demand to the Mediator and Defendants submitted a position statement.

On November 17, 2021, counsel for Plaintiffs and for Defendants attended the Mediation. By the conclusion of the Mediation, the Settling Parties were able to reach an agreement in principle regarding the material substantive terms of a settlement, including the Reforms. After this agreement on the substantive terms of the Settlement was reached, under the continued oversight of the Mediator, the Settling Parties were able to reach an agreement as to the attorneys' fees and expenses to be paid to Plaintiffs' Counsel. Specifically, the Settling Parties agreed that HCSG's insurer shall pay or cause to paid to Plaintiffs' Counsel the Fee and Expense Amount,

subject to Court approval.

**B.      The Allegations**

HCSG provides outsourced housekeeping and dining services to long-term and post-acute healthcare facilities in the United States.   Plaintiffs allege, *inter alia*, that certain members of HCSG's management team engaged in a long-term scheme to make it appear that the Company met or exceeded analysts' consensus estimates for the Company's EPS, a key financial metric commonly relied upon by investors and shareholders as an indicator of a company's profitability. Specifically, Plaintiffs allege that Defendants, in breach of their fiduciary duties, caused, or improperly allowed, HCSG to improperly round its EPS results upward for 44 quarterly financial filings.

As a result of the foregoing EPS manipulation, in March 2018, the SEC opened a formal investigation into the Company's EPS reporting practices. However, Defendants caused the Company to continue to conceal its EPS scheme, including the SEC's investigation, from shareholders.   Instead of disclosing these facts, Defendants, in the fourth quarter of 2018, authorized outside counsel to conduct an internal investigation into the matter, under the direction of the Company's Audit Committee.

It was not until a year after the SEC opened its investigation that, on March 4, 2019, HCSG revealed that the SEC had been investigating the Company's EPS calculations and practices for approximately 16 months. The Company further disclosed, for the first time, its internal investigation under the direction of the Company's Audit Committee, and announced that such investigation would cause the Company to be unable to timely file its annual report on Form 10-K.   As a result of the foregoing, the Securities Class Action was filed against the Company.

Plaintiffs further allege HCSG has been damaged by the foregoing wrongdoing.   The Company took a reserve accrual of over $30 million related to litigation costs in defending the

wrongdoing alleged herein.  In addition, a $16.8 million settlement of the Securities Class Action was approved on January 12, 2022.

## III.    STANDARDS GOVERNING FINAL APPROVAL

### A.    Settlements Are Generally Favored

Rule 23.1 of the Federal Rules of Civil Procedure requires court approval for the settlement of a derivative claim.  Fed. R. Civ. P. 23.1(c).  There is an overriding public interest in settling and quieting litigation, and this is particularly true in derivative matters, class actions, and other complex litigation.  *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged.")[7]; *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years").

"Shareholder derivative litigation is always 'notably difficult and unpredictable.'" *Plymouth Cnty. Contributory Ret. Sys. v. Hassan*,  2012 WL 664827, at *3 (D.N.J. Feb. 28, 2012); *see also In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("[T]he odds of winning [a] derivative lawsuit [a]re extremely small.").   Because derivative actions are "notoriously difficult and unpredictable," settlements of such actions "are particularly favored."  *Hugo ex rel. BankAtlantic Bancorp, Inc. v. Levan*,  2011 WL 13173025, at *4 (S.D. Fla. July 12, 2011) (quoting *In re AOL Time Warner S'holder Deriv. Litig.*,  2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006)). *See also Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of shareholder

---

[7] Unless otherwise noted, all internal citations are omitted and emphasis is added.

derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'" (quoting *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973))); *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986) (settlements of derivative actions are "favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself"); 4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11:41, at 87 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

**B.      The Proposed Settlement Meets the Standard for Final Approval**

Final approval of a derivative action requires the district court to determine whether "the settlement is fair, adequate, and reasonable." *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118 (3d Cir. 1990).

**C.      The *Girsh* Factors Support Final Approval of the Proposed Settlement**

The Third Circuit has made clear that the "principal factor" to be considered "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978).[8]  Also to be considered are the so-called "*Girsh*" factors, to wit:

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. . . .

---

[8] This assessment should be made, "in light of the best possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation." *Id.*

*Girsh*, 521 F.2d at 157 (ellipses in original) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)); *see also Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (the *Girsh* factors are relevant to assessing final approval of a derivative settlement); *Shlensky*, 574 F.2d at 147 ("[T]he standards annunciated in *Girsh* . . . have accordingly been applied, although perhaps with somewhat less rigor, in the settlement of shareholders' derivative suits."). Here, consideration of the "extent of the benefits" of the proposed Settlement to the Settling Defendants and the other *Girsh* factors all support final approval of the Settlement.

### 1.    The Settlement Offers Substantial Benefits to HCSG

The central calculus in evaluating any settlement involves weighing the benefits guaranteed by the settlement against the range of possible recovery through further litigation, discounted by the probability of success on the merits and the complexity, expense, and likely duration of the litigation. *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2017 WL 4167440, at *5 (E.D. Pa. Sept. 20, 2017) (the Court must "survey the possible risks of litigation in order to balance the likelihood of success . . . against the benefits of an immediate settlement").

The Settlement clears this hurdle.  The oversight claims asserted by Plaintiffs are widely recognized as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  Significantly, the Securities Class Action settled for $16.9 million during briefing on class certification.  The instant Settlement occurred after damages had been incurred by the Company in the form of the settlement of the Securities Class Action, and moreover, only after Plaintiffs examined the Company's internal controls through the inspection of Company books and records to further inform Settlement discussions.

The Settlement provides a comprehensive package of targeted corporate governance and internal controls reforms.  These Reforms provide benefits to HCSG shareholders because they

11

will substantially reduce the likelihood that the Company will suffer the damaging consequences of similar wrongdoing in the future.  Under the terms of the Settlement, the Reforms must be maintained for a period of three years.

The Reforms include improved processes for documenting, reviewing, and approving journal entries for the Company's accounting system, which is further enhanced by required reporting to Board committees from the Company's Chief Compliance Officer and General Counsel regarding legal and regulatory compliance issues and investigations, among other matters. The Company's internal controls have also been improved across relevant functions, including revised controls for the maintenance of financial records in accord with the SOX, internal audit, and enterprise risk management functions, which the Company instituted at the recommendation of an independent consultant, CFGI, the nation's largest non-audit accounting firm.  In addition, the Settlement requires the Company to maintain Director of Compliance and Director of Accounting positions, further enhancing the Company's internal audit and risk management functions.

The Reforms also ensure Board-level oversight over these matters through regular, direct reporting to the Audit Committee from both the Company's compliance and legal departments. And, they include strengthened Board oversight by virtue of a new independent director, who joined the Company in May 2020, leaving only one employee director on the Board.  The Reforms are targeted directly at the wrongdoing Plaintiffs allege, and thus significantly reduce the risk of such wrongdoing reoccurring at HCSG in the future.

It is well recognized that "a corporation may receive a 'substantial benefit' from a derivative suit . . . regardless of whether the benefit is pecuniary in nature." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970).  "[S]trong corporate governance is fundamental to the

economic well-being and success of a corporation[,]" and corporate governance reforms designed to prevent recurrence of alleged wrongdoing, "provide valuable benefits to public companies." *In re NVIDIA Corp. Deriv. Litig.*, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008). Where, as here, the alleged wrongdoing is significant and causes substantial damage to corporate interests, "the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor[.]" *Maher*, 714 F.2d at 461.

Settlements supported by corporate governance reforms "specifically designed to minimize the probability of violations of fiduciary duties" and violations of federal laws and regulations have been found to be reasonable and adequate. *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005). For example, the court in *In re Davita Healthcare Partners, Inc. Deriv. Litig.* granted final approval to a settlement of derivative litigation, stating:

> The fact that the settlement involves only corporate governance reforms (in addition to payment of attorneys' fees) does not weigh against approval of the settlement. To the contrary, the corporate governance reforms provided for as part of the settlement are specifically and appropriately designed to prevent the recurrence of the alleged misconduct that formed the basis for this action. Plaintiff's claims in this case challenged the Board's oversight of compliance with federal law – particularly with regard to the regulations governing Medicare billing and joint ventures – and the reforms are specifically directed at increasing this oversight.
>
> As such, the Court finds that the settlement directly addresses the alleged cause of the harms suffered by shareholders, and is fair and adequate, even in the absence of a monetary recovery.

2015 WL 3582265, at *3 (D. Colo. June 5, 2015). *See also In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving derivative settlement predicated on the creation of a Board Compliance Committee – "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005)

(holding corporate governance benefits designed "to prevent future harm" support settlement).

Whatever the merits of the claims, the recovery of a money judgment faced significant barriers, and the time, cost, and risks of attempting to improve on the Settlement recovery through further litigation with the hope of achieving a monetary judgment would have been substantial. Indeed, after Plaintiffs demanded that HCSG investigate Plaintiffs' claims, HCSG responded by successfully moving to stay further litigation before briefing could occur on motion(s) to dismiss, pending the outcome of an internal investigation conducted by a special litigation committee constituted by the Company.  Plaintiffs would therefore have needed to wait to review the results of any such investigation and incorporate further allegations in an amended complaint to address the Company's findings and conclusions, in the event the special litigation committee recommended that the Company not pursue Plaintiffs' claims.  Thus, the costs of proceeding with the litigation, and the associated delays would have been significant for both HCSG and Plaintiffs. Properly discounted for these costs, risks, and delays, the likelihood that a net monetary recovery substantially greater than the probable economic value of the Reforms would have been secured is speculative.

Taking these factors into account, the Reforms that Co-Lead Plaintiffs secured in the Settlement fall within a range that could be approved as fair, reasonable, and adequate.

### 2.     The Settlement Was Negotiated at Arm's Length

The Settlement was achieved through rigorous, arm's-length negotiations among sophisticated parties represented by experienced counsel, with the assistance of a well-regarded Mediator and which took place over the course of months and with the help of certain confirmatory discovery.  The involvement of the Mediator provides assurance that the negotiations occurred at arm's length, without fraud or collusion.  *See In re Viropharma Inc. Sec. Litig.*, 2016 WL 312108, at *8 (E.D. Pa. Jan. 25, 2016) (noting the involvement, "of an experienced mediator . . .," indicated

that the presence of an independent mediator during settlement discussions practically ensures the negotiations were arm's length and devoid of collusion); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("[M]ediator's involvement . . . helps to ensure that the proceedings were free of collusion and undue pressure."); *George v. Acad. Mortgage Corp. (UT)*, 369 F. Supp.3d 1356, 1370 (N.D. Ga. 2019) ("[M]ediation with an experienced mediator . . . further confirms that the process was procedurally sound and not collusive."); *Hall v. AT & T Mobility LLC*,  2010 WL 4053547, at *7 (D.N.J. Oct. 13, 2010) ("The participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties.").

### 3.        Plaintiffs Are Well Represented

HCSG shareholders have been well represented by Co-Lead Plaintiffs and their counsel. Here, each counsel are experienced in derivative and corporate governance litigation and, as such, significant weight is given to their belief that settlement is in the best interest of the corporation. *See In re Hemispherx Biopharma, Inc., Sec. Litig.*,  2011 WL 13380384, at *7 (E.D. Pa. Feb. 14, 2011) (citing *Austin v. Pa. Dep't of Corr.*, 876 F. Supp. 1437, 1472 (E.D. Pa. 1995)); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *Levan*, 2011 WL 13173025, at *5; *Reed v. GMC*, 703 F.2d 170, 175 (5th Cir. 1983) ("[T]he value of the assessment of able counsel negotiating at arms' length cannot be gainsaid.").

### 4.        The Complexity, Expense, and Likely Duration of the Litigation

The *Girsh* factors also take into account the complexity, expense, and likely duration of the litigation, specifically the "probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001); *GMC Pick-Up*, 55 F.3d at 812.  The Settlement was attained over two years after the first demand on the Company was made.  For this case to continue, Plaintiffs would have to overcome the effective refusal of their demand, including

potentially waiting for an internal investigation to be conducted by the Company, and then, if appropriate, refuting a final report and its conclusions on the matter.  Any ongoing litigation in this Court would likely have taken many months—possibly extending into years, complete with extensive discovery (including production and review of numerous documents, summary judgment motions, depositions of HCSG directors and officers), involvement and depositions of experts, and likely post-trial motions and appeals. *See Vinh Du v. Blackford*,  2018 WL 6604484, at *6 (D. Del. Dec. 18, 2018) (approving settlement, noting that, "[c]ontinued litigation would have also required significant and costly expert discovery.  Summary judgment motions have not yet been filed and, thus, the litigation would have continued for a substantial period of time"); *Viropharma*, 2016 WL 312108, at *10 (noting that, "[i]f this case were to proceed to trial, it would likely take years" because the case presented, "a complicated matter necessarily requiring extensive briefing"); *Davita*, 2015 WL 3582265, at *3 (granting final approval where plaintiff's, "claims were premised on a complex theory of corporations law, the success of which was unpredictable").

In short, the significant uncertainty and costs Plaintiffs faced had they continued this litigation weighs in favor of approving the Settlement.

### 5.    The Reaction of the Shareholders to the Settlement

The absence of opposition to a settlement by affected parties is a factor supporting judicial approval of a settlement.  *See, e.g.*, *Mohammed v. Ellis*,  2014 WL 4212687, at *4 (D. Colo. Aug. 26, 2014) ("[T]he fact that no objections to the settlement were filed by any shareholder weighs heavily in favor of approval of the derivative litigation settlement."); *AOL Time Warner*, 2006 WL 2572114, at *6 (in shareholder derivative action, "'the lack of objections may well evidence the fairness of the Settlement'").  Despite the widespread notice of the Settlement approved by this Court, no HCSG shareholder has filed an objection to any aspect of the Settlement.

### 6.      The Stage of Proceedings at Which Settlement Was Achieved

The stage of the proceedings at the time of Settlement weighs in favor of approving, or is at least neutral with respect to, final approval.  Plaintiffs first issued a litigation demand on the Company to investigate claims against certain directors and officers on April 24, 2019.  Then, as part of their investigation in ongoing settlement communications, Co-Lead Plaintiffs received certain discovery and information during the mediation process.  Thus, while there was no formal discovery in the case, Co-Lead Plaintiffs received internal Company documents pursuant to document requests submitted in connection with mediation to confirm the fairness of the Settlement.  Moreover, formal proceedings and discovery are not required for plaintiffs to assess the merits of their claims and their likelihood of success.  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436-37 (3d Cir. 2016), *as amended* May 2, 2016 (holding formal discovery was not required to support settlement and that, "[i]n some cases, informal discovery will be enough for class counsel to assess the value of the class' claims and negotiate a settlement that provides fair compensation").

As a result of their research, investigation, and informal discovery, Co-Lead Plaintiffs maintain they were able to make an informed decision about the relative strengths and weaknesses of the case and the corporate governance reforms instituted at the Company, informing themselves on the adequacy of the Settlement at an early stage of the proceedings.  *See In re Ocean Power Techs., Inc.*,  2016 WL 6778218, at *17 (D.N.J. Nov. 15, 2016) (approving settlement prior to discovery because of counsel's investigation); *Schuler v. Meds. Co.*,  2016 WL 3457218, at *7 (D.N.J. June 24, 2016) (same).

Accordingly, the litigation status of this action weighs in favor of approving, or is at least neutral with respect to, the Settlement.

### 7.      Risks in Establishing Liability and Damages

The fourth and fifth *Girsh* factors include a "survey [of] the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *Warfarin*, 391 F.3d at 537.  In other words, these two factors attempt, "to measure the expected value of litigating the action rather than settling it at the current time." *Cendant Corp.*, 264 F.3d at 238.  Both of these factors weigh in favor of final approval of the Settlement.

Here, Plaintiffs would have faced significant hurdles in ultimately prevailing.  Derivative settlements are notoriously difficult and unpredictable, and this case is no different.  Plaintiffs faced an initial hurdle and uncertainty in making a demand on the Company to pursue litigation, and having to plead that the demand was wrongfully refused under Federal Rule of Civil Procedure 23.1.  *See Watts*, 2005 WL 2877899, at *4 (approving settlement where, "Plaintiffs face the 'difficulties inherent in derivative litigation as well as significant procedural and substantive obstacles' . . . [including] sufficient compliance with the demand requirement of Fed. R. Civ. P. 23.1 . . ."); *Davita*, 2015 WL 3582265, at *3 ("The Court finds that the significant uncertainty Plaintiff faced had it pursued this litigation weighs in favor of approving the settlement.").

Proving both liability and damages would be equally difficult.  Plaintiffs' claim is based on a breach of the fiduciary duty of loyalty through failure to oversee HCSG's operations.  Such *Caremark* claims present "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 372 (Del. 2006).  To prevail on a *Caremark* claim, a plaintiff must show that a fiduciary (*e.g.*, a director) acted in bad faith – "the state of mind traditionally used to define the mindset of a disloyal director."  *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007).  Bad faith is established on a *Caremark* claim when "the directors [completely] fail [] to implement any reporting or

information system or controls or . . . having implemented such a system or controls, consciously fail[] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370.  As the Delaware Supreme Court has explained, Delaware "case law gives deference to boards and has dismissed *Caremark* cases even when illegal or harmful company activities escaped detection, when the plaintiffs have been unable to plead that the board failed to make the required good faith effort to put a reasonable compliance and reporting system in place." *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019). In addition, because Plaintiffs have made a demand on the HCSG Board to pursue litigation on behalf of the Company, they would also have to prove that the HCSG Board did not adequately consider and act on Plaintiffs' litigation demands – wrongfully refusing the demands. *See Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 975 (Del. Ch. 2013).  Because corporate boards' litigation decisions are generally protected by the business judgment rule, this showing is not an insignificant hurdle. *Id.* at 977.  Co-Lead Plaintiffs and their counsel considered these risks in determining that the Settlement was appropriate.

These factors therefore weigh heavily in favor of final approval.

### 8.    Risks of Maintaining the Action Through Trial

As explained above, there are significant hurdles that Plaintiffs must overcome, including those imposed by the demand requirements under Federal Rule of Civil Procedure 23.1.  Moreover, the continuation of this litigation would be expensive for all parties and would likely be lengthy. HCSG would likely hire independent counsel to investigate Plaintiffs' litigation demands, and Plaintiffs would likely be required to conduct further investigation of their own in order to investigate the processes and conclusion of that investigation.  These facts provide further support for the Settlement. *See Levan*, 2011 WL 13173025, at *7 (granting final approval where "the continuation of this litigation would require the resolution of numerous complex issues of law at

the cost of considerable time and expense to the Parties and the Court"); *In re Galena Biopharma, Inc. Deriv. Litig.*, 2016 WL 10840600, at *2 (D. Or. June 24, 2016) (granting final approval, and noting, "[i]t would be expensive to litigate through trial, including expensive discovery, likely additional pretrial and trial motions, and a trial on the merits.  Without a settlement, Galena's insurance policy limits will continue to be depleted by defense costs and the financial benefit to the Company will likely be diminished").

### 9.        Defendants' Ability to Withstand a Greater Judgment

As the Settlement does not include a monetary component, Defendants' ability to withstand a greater judgment is not relevant.  *See Du*, 2018 WL 6604484, at *7 ("In that there is no monetary component to this settlement, this factor [is] inapplicable.").

### 10.        The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of the Litigation Risks

The final two *Girsh* factors evaluate whether the settlement represents a fair and "good value for a weak case or a poor value for a strong case."  *Warfarin*, 391 F.3d at 538.  As discussed *supra*, Co-Lead Plaintiffs face a real risk of proving their claims, so these factors weigh in favor of approving the Settlement, which attains a real benefit for the Company.  *See In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 191 (E.D. Pa. 2000) ("In light of the difficulties that would likely have attended any full-fledged suit on the merits of this case and of the continued diminution of the insurance policies, settlement of this derivative action is reasonable and in [the corporation's] best interests.").  Also supporting the Settlement, Plaintiffs are able to obtain substantial benefits and implementation of the Reforms now, rather than any award to be obtained following a trial.  *See Watts*, 2005 WL 2877899, at *4 ("The settlement provides immediate and substantial benefits for all parties and represents a better option than little or no recovery at all.").  Accordingly, these factors support final approval of the Settlement.

IV.    **THE NOTICE SATISFIES DUE PROCESS**

Notice to shareholders must be "reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *George*, 369 F. Supp. 3d at 1369 (brackets in original).  Here, pursuant to this Court's Preliminary Approval Order, HCSG posted notice in a filing with the SEC on Form 8-K on June 17, 2022, and on the "Investors" section of the Company's website.  Such notice is adequate to satisfy due process.

V.    **CO-LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES SHALL BE GRANTED**

Plaintiffs seek an award of attorneys' fees and expenses of $1 million.[9]  For the reasons set forth below, that Fee and Expense Request is reasonable and shall be granted.

A.    **Each of the Relevant Factors Supports Granting the Fee and Expense Request**

Under the "substantial benefit" doctrine, counsel who prosecute a shareholder derivative case which confers benefits on the corporation are entitled to an award of attorneys' fees and costs. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975) (equity permits plaintiffs to recoup attorneys' fees and costs of litigation directly from the parties enjoying the benefits of the litigation).  As explained by the Third Circuit:

> The plaintiffs in a shareholders' derivative action may, thus, recover their expenses, including attorneys' fees, from the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or nonmonetary, from their successful prosecution or settlement of the case.

*Shlensky*, 574 F.2d at 149. *See also Mills*, 396 U.S. at 395-96 ("[A] corporation may receive a 'substantial benefit' from a [stockholders' derivative action], justifying an award of counsel fees,

---

[9] The Notice informed shareholders that Plaintiffs would seek up to $1 million in attorneys' fees and expenses.

regardless of whether the benefit is pecuniary in nature," as "regardless of the relief granted, private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders").

The Third Circuit has established seven factors to be weigh in determining an appropriate fee award:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).

Other factors that may be relevant to consider are:

> [(i)] the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as governmental agencies conducting investigations; [(ii)] the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and [(iii)] any innovative settlement terms.

*Esslinger v. HSBC Bank of Nev., N.A.*,  2012 WL 5866074, at *12 (E.D. Pa. Nov. 20, 2012).; *see also In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009).

### 1.    The Substantial Benefit Conferred upon HCSG

The first factor is the benefit of the corporate governance reforms obtained through the Settlement.  Here, as explained *supra* the Reforms are valuable in that they address the core of the governance problems at the Company and are designed to reduce the likelihood of a reoccurrence of the wrongdoing alleged by Plaintiffs.  Here, the Reforms required under the Settlement provide value to HCSG shareholders in the form of improved compliance regimes and corporate governance, as well as enhanced shareholder value by virtue of the avoidance of future costly errors in internal control over financial reporting.  The substantial value which the Settlement

confers on HCSG and its shareholders supports awarding the full Fee and Expense Request.

### 2. The Absence of Any Objections

As explained above, to date, no HCSG shareholder has filed any objections to any aspect of the Settlement. Nor has any shareholder filed any objection to the request for attorneys' fees and expenses. This factor therefore weighs in favor of an award for attorneys' fees and expenses. *See Viropharma*, 2016 WL 312108, at *16 (absence of objections weighed in favor of award of attorneys' fees); *W. Palm Beach*, 2017 WL 4167440, at *8 (same).

### 3. The Skill and Efficiency of Co-Lead Counsel

This litigation involved talented lawyers on both sides. The skill and efficiency of Co-Lead Counsel, Rigrodsky Law, P.A. and Scott+Scott Attorneys at Law LLP, is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Hall*, 2010 WL 4053547, at *19. Here, through the Settlement, Co-Lead Counsel secured important governance reforms valuable to HCSG which supports the Fee and Expense Request. *See In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 132 (D.N.J. 2002) ("[T]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained.") (internal quotations omitted). Each law firm among Co-Lead Counsel are highly experienced in class and derivative corporate governance litigation. Further, they were up against some heavy hitters: Defendants are represented by Troutman Pepper, a highly regarded defense firm which zealously represented its clients throughout the litigation and settlement negotiations. *See Hall*, 2010 WL 4053547, at *19 ("The quality of opposing counsel is also important in evaluating the quality of counsel's work.").

Thus, the quality of Co-Lead Counsel's representation in this derivative action supports the Fee and Expense Request.

### 4.      The Complexity, Expense, and Likely Duration of the Litigation Weigh in Favor of Co-Lead Counsel's Fee and Expense Request

The fourth *Gunter* factor is intended to capture, "the probable costs, in both time and money, of continued litigation." *GMC Pick-Up*, 55 F.3d at 812.  This factor also assesses the "complexity, expense and likely duration of the litigation." *In re AT & T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006).  This factor also supports the Fee and Expense Request.

Co-Lead Counsel tackled the complex issues presented in this matter with efficiency in: (i) preparing and serving HCSG with a litigation demand for the Company to investigate the wrongdoing described therein and further detailed in the complaints; (ii) researching and reviewing numerous HCSG public SEC filings, analyst reports, news articles, and other materials; (iii) researching and reviewing allegations from the related Securities Class Action, including internal Company information the securities class plaintiffs obtained from confidential witnesses; and (iv) drafting complex complaints with allegations gleaned from the findings of the foregoing investigation.  All while facing the risk that the litigation could be foreclosed.  *See, e.g.*, *In re Cendant Corp., Deriv. Action Litig.*, 232 F. Supp. 2d 327, 335-36 (D.N.J. 2002) ("The chief risk in maintaining this derivative action is that the Special Litigation Committee might choose to reject the case, thereby potentially putting an end to it.  A special litigation committee has the authority under certain circumstances to move to dismiss a derivative lawsuit if, in its judgment, further pursuit of its claims would not benefit the corporation.").  The difficulty of the legal and factual issues confronting Plaintiffs as well as the very real risk of not prevailing on their claims all suggest that the Fee and Expense Request is reasonable.

### 5.      Co-Lead Counsel Spent Significant Time Investigating and Litigating the Case

This factor considers the time counsel expended in litigating the case.  *Gunter*, 223 F.3d at 199.  This factor is usually considered with the lodestar cross-check to assess the reasonableness

of counsel's requested fee.  *See id.*  Accordingly, this factor is addressed in connection with the lodestar cross-check.

### 6.    The Requested Fee Is Consistent with Awards in Similar Cases

The $1 million Fee and Expense Request is appropriate and within the range of fees typically awarded in similar cases involving corporate governance reforms and similar non-monetary relief.  Other similarly situated derivative cases have settled for substantial corporate governance changes like those detailed in the Settlement, with significantly higher fees being awarded to plaintiffs' counsel.  *See, e.g.*, *Cnty. of York Emps. Ret. Plan v. Jung*, No. 651304/2010 (N.Y. Sup. Ct. Aug. 1, 2016) (approving governance settlement, including FCPA compliance and internal audit reforms, and awarding $4 million in fees and expenses) (Jacobsen Decl., Exs. 4 & 5); *In re DaVita Healthcare Partners, Inc. Deriv. Litig.*, No. 1:12-cv-02074 (D. Colo. June 5, 2015) (approving governance settlement, including establishing a lead independent director and enacting reforms designed to enhance compliance with healthcare laws and regulations and increasing transparency, and awarding approximately $6.2 million in fees and expenses) (Jacobsen Decl., Exs. 6 & 7); *Rubery v. Kleinfeld*, No. 2:12-cv-00844 (W.D. Pa. Jan. 20, 2015) (*Alcoa, Inc. Deriv. Litig.* ) (approving governance settlement, including FCPA compliance and governance reforms, and awarding $3.75 million in fees and expenses) (Jacobsen Decl., Exs. 8 & 9); *In re Johnson & Johnson Deriv. Litig.*, No. 3:10-cv-02033 (FLW), 2013 WL 6163858 (D.N.J. Nov. 25, 2013) (approving corporate governance reforms, including enhanced board oversight for enterprise risk management and product risk, supply chain, and quality control standards, and awarding approximately $5.8 million in fees and expenses) (Jacobsen Decl., Exs. 10 & 11); *In re Yahoo! S'holders Litig.*, No. 3561-CC, 2009 WL 6598374 (Del. Ch. Mar. 6, 2009) (approving "substantial benefit" of reducing executive compensation severance packages, which would increase opportunities for Yahoo! to engage in strategic transactions, and awarding $8.4 million in fees and

expenses) (Jacobsen Decl., Exs. 12 & 13); *Moore v. Brown*, No. 6:04-cv-00077 (E.D. Tex. Jan. 30, 2008 & Mar. 10, 2008) (*Elec. Data Sys. Corp. Deriv. Litig.* ) (approving governance settlement, including independence enhancements and the formalization of certain director responsibilities, and awarding $6 million in fees and expenses) (Jacobsen Decl., Exs. 14 & 15); *In re MiMedx Grp., Inc. S'holder Deriv. Litig.*, No. 1:18-cv-04486 (N.D. Ga.) (approving governance settlement including independence enhancements and compliance and oversight enhancements, awarding $3.5 million in fees and expenses) (Jacobsen Decl., Exs. 16 & 17).

Thus, this factor, along with the other *Gunter* factors, weighs in favor of granting the Fee and Expense Request.

### 7.   The *Prudential* Factors

The applicable *Prudential* factors also weigh in favor of the Fee and Expense Request. Whether counsel benefited from a governmental investigation or enforcement action concerning the alleged wrongdoing can indicate whether or not counsel should be given full credit for obtaining the value of the settlement.   *See In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 338 (3d. Cir. 1998).   Here, while there was an inquiry conducted by the SEC, there were no findings or admissions by HCSG of fraud or misconduct, nor any helpful testimony or documents produced in such investigations for Plaintiffs to rely on here.   Nor did any governmental investigation or action result in the corporate governance reforms obtained here. Instead, as the Company has agreed, the reforms obtained through the Settlement were "substantially due to the institution, prosecution, and settlement of" Plaintiffs' lawsuits and demands.   The Fee and Expense Request is therefore further supported by this analysis.   *See, e.g.*, *AT & T Corp.*, 455 F.3d at 173; *In re CIGNA Corp.*,   2007 WL 2071898, at *6 (E.D. Pa. July 13, 2007); *In re Vicuron Pharms., Inc. Sec. Litig.*, 512 F. Supp. 2d 279, 287 (E.D. Pa. 2007).

**B.      A Lodestar Cross-Check Confirms the Reasonableness of the Fee Request**

A lodestar cross-check is a tool to, "ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 188 (3d Cir. 2005).  The Fee and Expense Request here is reasonable and in line with fee requests approved in this Circuit and elsewhere.

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *In re Rite Aid Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005).  "The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Id*. at 305-06.  The multiplier also is designed "to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation." *In re Aetna Inc.*, 2001 WL 20928, at *15 (E.D. Pa. Jan. 4, 2001).  To perform the cross-check, the proposed fee award must be divided by the lodestar calculation, which will yield a lodestar multiplier.  *AT & T Corp.*, 455 F.3d at 164. This calculation "need entail neither mathematical precision nor bean-counting.  The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *Rite Aid*, 396 F.3d at 306-07 (footnote omitted).

Since the inception of this case through April 6, 2022, Co-Lead Counsel's combined lodestar, *i.e.*, the value of their work had they been paid on an hourly basis, is $496,935.25, for 687.35 hours.  *See* Jacobsen Decl., Exs. 18-19.  Among other things, Co-Lead Counsel thoroughly investigated the case, including reviewing public filings and further factual research, served litigation demands on the Company pursuant to Federal Rule of Civil Procedure 23.1, negotiated with Company counsel regarding the Company's response to the demands, filed complaints in this Court and the Court of Common Pleas of Bucks County, Pennsylvania, prepared an opening

settlement demand and mediation statement, reviewed confirmatory discovery from the Company regarding internal controls over financial reporting and other corporate governance, negotiated further records to confirm the adequacy of the Settlement, prepared for and attended a mediation session, negotiated the Settlement with Defendants, and prepared and filed the preliminary approval and final approval Settlement papers.

In addition to the time and expenses of counsel in this Action, at the request of the Defendants who sought global peace, the Settlement includes the time and expenses of counsel for the actions in the Court of Common Pleas of Bucks County and the additional related demands made on the Company.  As set forth in their respective declarations, they spent time, effort, and expenses pursuing those actions and demands, respectively.   Since the inception of this case through April 6, 2022, their collective lodestar, *i.e.*, the value of their work had they been paid on an hourly basis, is $469,953 for 678.35 hours.  *See* Jacobsen Decl., Exs. 20-22.  Taken together, all Plaintiffs' collective lodestar is a combined $966,888.25, for 1,365.7 hours of work.  *See* Jacobsen Decl., Exs. 18-22.

After deducting expenses in the amount of $19,783.65, the multiplier generated here by the ratio of Co-Lead Counsel's net fee request of $1 million to Co-Lead Counsel's lodestar in this Action only—*i.e.*, excluding the lodestar of counsel in the State Court Actions and the Shareholder Demands—is 2.01.  This multiplier is lower than those approved and acknowledged as reasonable within this Circuit and around the country.  *See, e.g.*, *AT & T Corp.*, 455 F.3d at 173 ("[W]e approved of a lodestar multiplier of 2.99 in *Cendant PRIDES*, in a case we stated 'was neither legally nor factually complex'" and that settled in 4 months); *Teamsters Local 456 Pension Fund v. UHS*, C.A. No. 2:17-cv-02817-JHS (Order) (approving fees with multiplier of 2.2); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,  2005 WL 1213926, at *18 (E.D. Pa. May 19,

2005) (approving lodestar multiplier of 15.6); *Schuler*, 2016 WL 3457218, at *9-10 (lodestar multiplier of 3.57 reasonable in case that settled before decision on motion to dismiss); *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 104 (D.N.J. 2001) (noting multipliers ranging from 2.04 to 3.6 and holding that a 2.81 multiplier "appears reasonable"); *Ikon*, 194 F.R.D. at 195 ("[M]ultiplier of 2.7 is well within the range of those awarded in similar cases."); *In re Schering-Plough/Merck Merger Litig.*, 2010 WL 1257722, at *18 (D.N.J. Mar. 26, 2010) (2.18 multiplier was "not uncommon"); *In re Royal Dutch/Shell Transp. Sec. Litig.*, 2008 WL 9447623, at *26 (D.N.J. Dec. 9, 2008) (multipliers range from 1.8 "on the low end of the spectrum" to 6.96); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (approving lodestar multiplier of 3.97); *Meijer, Inc. v. 3M*, 2006 WL 2382718, at *24 (E.D. Pa. Aug. 14, 2006) (approving lodestar multiplier of 4.77); *In re Ravisent Techs., Inc. Sec. Litig.*, 2005 WL 906361, at *12 (E.D. Pa. Apr. 18, 2005) ("Lodestar multiples of less than four are well within the range awarded by courts in this Circuit."); *Yedlowski v. Roka Bioscience, Inc.*, 2016 WL 6661336, at *18 (D.N.J. Nov. 10, 2016) (3.4 multiplier awarded).

### C.   Plaintiffs' Counsel's Expenses Were Reasonable and Necessary to Litigate This Action

Counsel in class and derivative actions are "entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *Cendant*, 232 F. Supp. 2d at 343.  Co-Lead Counsel's total Fee and Expense Request, $6,404.47, represents various expenses, including fees for the mediation services provided by the Mediator.  *See* Jacobsen Decl., Exs. 18 & 19.  The Mediation was instrumental to achieving the Settlement.  The remainder of Co-Lead Counsel's expenses were primarily court filing fees, online legal research and data management fees, and other miscellaneous expenses.  *Id*.  These items are properly incurred and recoverable.

**VI.     CONCLUSION**

For the foregoing reasons, the motions for final approval to the proposed Settlement and to award Co-Lead Counsel fees and expenses shall be granted.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**